[Crim. No. 7865. Second Dist., Div. Three. May 21, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. HARRY FINCH et al., Defendants and Appellants.

Ramsey & Emlein for Defendants and Appellants.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

SHINN, P. J.—By indictment James Thiele, a Long Beach police officer, was accused in count I of having accepted a bribe of $3,000 in 1957. In counts III, VI, VII, VIII and IX, both Thiele and Harry Finch, who was also a police officer of Long Beach, were accused of soliciting one Henry, also a police officer, to accept and join in the acceptance of a bribe and join in the commission of extortion; in counts IV and V, both defendants were accused of soliciting one Jordan, another police officer, to accept and join in the acceptance of a bribe and join in the commission of extortion. In count X, they were accused of conspiracy to ask for and receive and agree to receive bribes and extort money from one Garland and to solicit Jordan and Henry to ask for, receive and agree to receive bribes and extort money from Garland.

In a jury trial Thiele was acquitted upon count I, both defendants were acquitted upon counts II, III and IV and both were convicted upon counts V to X, inclusive. Their motions

for a new trial were denied and both defendants appeal from the judgment and the order denying their motion.

The grounds of appeal are (1) it was error to develop in the cross-examination of a witness for the defense that he had refused to testify before the grand jury upon the ground of self-incrimination; (2) the jurors were coerced into returning verdicts by being retained in session into the ninth day; (3) error was committed in the use of recordings and transcripts of recordings of conversations with the defendants; (4) a memorandum prepared by police officers (Exhibit 6) was improperly received in evidence; and (5) defendants were twice punished for the same acts.

It is not contended there was insufficient evidence to justify the verdicts. Defendants' attorneys properly recognize that there was sufficient evidence that defendants solicited Jordan or Henry to commit the crimes charged, at the times stated in the several counts of the indictment.

Although the issues were comparatively simple the record on appeal consists of more than 5,000 pages of testimony and the briefs are voluminous.

The active participants in the events which led to the prosecution were Detective Inspectors Finch and Thiele, Patrolmen Jordan and Henry, and the intended victim of the proposed extortion, Dr. Garland, a colored physician practicing in Long Beach. Detective Captain Martin and Lieutenant Black were kept informed of some of the activities of the principals. The following summary of the evidence will suffice for disposition of the points on appeal.

Dr. Garland was accused of abortion in 1957, but upon his trial was acquitted. Count I of the present prosecution charged that, in connection with the prosecution of Dr. Garland, Thiele received from Garland a bribe of $3,000.

A substantial portion of the evidence related to Count I on which Thiele was acquitted. As to the other counts the activities of Finch and Thiele, Jordan and Henry, as developed by the evidence of the People, commenced in February 1960, and were to continue until early September. Several amounts of money were given by Dr. Garland to Jordan and Henry. He was told that Jordan had been sent to him by Finch and Thiele to represent that they (Finch and Thiele), unless bought off, would accuse Garland of the commission of abortions. He understood that Jordan and Henry were laying a foundation for charges against Finch and Thiele and agreed to cooperate with them.

According to the evidence of the People, defendants first solicited commission of the offenses by Jordan and Henry in the early part of February 1960. They proposed that Jordan represent to Garland that they, Finch and Thiele, would instigate prosecution of Garland for abortion unless they were paid $400 per month. It was understood that the four officers would participate, and as the money was received, it was divided into five equal shares, one share each to Jordan, Henry, Finch and Thiele, and one share, supposedly, to Captain Martin, the superior of Finch and Thiele. Jordan and Henry reported the situation to Lieutenant Black and thereafter acted under his instructions and those of other officers.

February 8, 1960, Garland gave Jordan $400, which he gave to Thiele. Of this sum $150 was given to Jordan as the shares of himself and Henry and was returned to Garland. About April 20th Garland gave Jordan $250 which he gave to Thiele. Jordan was given $50 by Thiele and Henry received $50 from Finch. June 6th, Garland was provided with $150 by Deputy Landry of the sheriff's office, and Garland gave this money to Thiele who gave $30 to Jordan and $30 to Henry. June 13th, Henry received $150 from Landry, gave it to Finch and received from the latter $30 for himself and $30 for Jordan. About July 11th Deputy Sheriff Landry provided Henry with $400. The money was given to Thiele, who gave Jordan and Henry each $80. July 27th, Landry provided Henry with $200. Henry met Finch and gave him the money, but at the direction of Finch took $80 as his and Jordan's shares. This sum was returned to Landry. September 2nd, Landry gave Henry $550. Henry told Finch he had received $600 from Garland and had it in his car. Finch sent Thiele with Henry to the car, where Thiele received $550 and told Henry to get another $50 from the doctor. Thiele gave Henry $220, whereupon Lieutenant Black and other officers appeared, placed Thiele under arrest and found $330 of marked bills in his pocket. Five hundred forty dollars in some 40 small bills had been in the possession of Finch, assertedly as evidence, but at the suggestion of Captain Martin, these had been exchanged for larger bills. When Finch was arrested, he was carrying $1,414; Thiele was carrying $550, of which $400 was in $100 bills folded up and tucked into his "badge case."

It will simplify matters somewhat to point out that the events which took place between February 8th and September 2nd should be considered as divided into two phases, one,

those occurrences between February and April 26th, and the other, between the latter date and September 2nd. Counts II, III and IV, which involved both defendants, charged offenses committed February 8th, March 10th and April 8th. The defendants denied that they had solicited Jordan or Henry to contact Dr. Garland for any purpose and they denied having received any money from Dr. Garland or Jordan or Henry prior to April 26th, when Henry gave Finch $30, which, according to Finch, was returned to Henry. Their explanation of their activities from that time on was that Henry admitted to them that he and Jordan had been taking money from Dr. Garland, proposed that Finch and Thiele join with them in obtaining up to $400 per month from Garland; they (Finch and Thiele) took the matter under advisement, talked with Jordan, who also invited them to join in extorting bribe money from Garland, and they agreed, with the approval of Captain Martin, to go along in the scheme, but only for the purpose of entrapping Jordan and Henry. They admitted their participation in the activities which were the basis of counts V, VI, VII, VIII and IX. They testified that all the sums they received were shown to Captain Martin, and that they acted at all times under his direction.

There was no material conflict in the evidence as to the actions of the four officers after April 26th. All the jury had to decide as to the several counts was which pair was acting with criminal intent and which pair with the purpose and expectation of fastening the crimes upon the other. The distinguishing feature of the execution of the plan was that Jordan and Henry made known their actions and purpose to Lieutenant Black, who, with Chief Mooney, enlisted the cooperation of members of the sheriff's force and the district attorney's office, whereas the activities of Finch and Thiele were made known only to Captain Martin.

The grand jury undertook an investigation of the activities of Finch and Thiele. Captain Martin was requested to appear in the investigation. He was not served with a subpoena, nor was that process customarily used to obtain the presence of peace officers. Martin appeared, was called as a witness and refused to testify upon the ground of self-incrimination and upon the advice of his attorney. Upon the trial he testified at length, explaining that he participated and cooperated with the defendants and directed their activities for the purpose of laying a foundation for the apprehension of Jordan and Henry, upon the represen-

tation of defendants that Jordan and Henry were extorting money from Dr. Garland. Martin was questioned by defense counsel whether he had not refused to answer numerous questions before the grand jury upon the ground of self-incrimination.[1] Martin answered that he had refused to testify on the ground of self-incrimination and upon the advice of his attorney. It is strongly urged that the ruling was grievous error.

It appears that the court considered the fact of Martin's refusal to testify before the grand jury on the ground of self-incrimination to be admissible for the purpose of impeachment. The court relied upon *People* v. *Kynette,* 15 Cal.2d 731 [104 P.2d 794] and *People* v. *Wayne,* 41 Cal.2d 814 [264 P.2d 547], as authority for the admission of the evidence of Martin for impeachment purposes. Defendants urge that the holding in *Kynette* and *Wayne* that the refusal of a witness to testify upon a former occasion upon the ground of self-incrimination is admissible as impeaching evidence was overruled in *People* v. *Calhoun,* 50 Cal.2d 137 [323 P.2d 427] and *People* v. *Snyder,* 50 Cal.2d 190 [324 P.2d 1]. The People reply that the latter cases held only that evidence of a former refusal to testify is inadmissible and not to be considered as indicating a consciousness of guilt or as a basis for a finding of guilt, and that it was error to permit its consideration for those purposes. It is unnecessary for us to consider this point. Even if it was error to permit the questioned cross-examination of Martin defendants suffered no prejudice therefrom. Before Martin was examined Thiele was asked on cross-examination: "Q.: As a matter of fact, you know he [Martin] appeared before the Grand Jury and refused to testify, don't you?" and he answered: "I do know that, yes, sir." Finch was questioned on cross-examination as follows: "Did you ask him what he had said before the Grand Jury? A.: He told me why he didn't testify. Q.: He told you that he had refused to testify on the ground of self-incrimination, didn't he? A.: No, he didn't. Q.: Now, at some time you did learn that it was a fact, though, didn't you? A.: Yes." There was no objection to this interrogation.

---

[1] In chambers it was disclosed that the district attorney proposed to ask Martin on cross-examination whether he had not refused to testify before the grand jury upon the ground of self-incrimination. Defendants interposed an objection to the proposed questioning and their objection was overruled. Counsel then announced that in view of the court's ruling they would question Martin on the subject. We, therefore, treat the evidence as if it had been elicited upon cross-examination.

By this testimony the jury was unequivocally made acquainted with the fact that Martin had refused to testify before the grand jury upon the ground of self-incrimination, and the only fact that was added in the examination of Martin was that in refusing to testify he was acting upon the advice of his attorney. If any prejudice resulted it was from the testimony of the defendants, to which no objection was made. The claim of prejudice cannot be sustained.

The next point is that the deliberations of the jury were extended into the ninth day and that they were thereby coerced into arriving at verdicts which otherwise might not have been reached. During the deliberations two jurors became ill and were examined by physicians. One of them was taken into the judge's chambers and was removed separately to the Alexandria Hotel where the jurors were staying. She was attended by a physician whose office was in the hotel and was found to be only slightly indisposed. The other jurors were returned to the hotel. All this occurred after 4:15 p.m. The juror was at all times in custody of the bailiff or a female deputy sheriff and no mention was made of the case on trial.

These facts do not sustain the claim that the jury was coerced into returning the verdicts. As previously stated, a great deal of the evidence in the case related to the charge of bribery in count I, and the details of the activities of the defendants and other participants were related by some thirty witnesses. The fact that defendants were acquitted upon four counts of the indictment clearly indicates that the jurors scrutinized carefully the evidence relating to each of the offenses charged. No complaint came from them that their confinement was causing them discomfort. The indisposition of two of the jurors was of slight significance. The court at no time endeavored to hasten the deliberations. It was not intimated to the court at any time that it was improbable that verdicts would be agreed upon; the court had reason to believe that progress was being made and that the jurors did not consider their retention to be burdensome, or in any manner coercive. Although the jurors were kept in session for an unusual length of time they had an unusual task, since they had 10 counts of the indictment and a vast amount of testimony to consider and it is, of course, undeniable that the ends of justice were better served by the consideration that was given deliberately to each separate offense charged than would have been the case if the jurors had acted hastily. There

was evidence that would have supported a finding of guilt upon each of the 10 counts of the indictment, and there is no more reason to believe that the defendants suffered harm than that they derived benefit from the lengthy deliberations. The defendants made motions for mistrial and for the discharge of the jurors, which were denied. The matter was within the discretion of the court, and we find no error or abuse of discretion in the procedure.

 Upon three occasions, June 7th, July 11th and July 26th, a recording device provided by the sheriff's office was carried by Henry or was placed in Jordan's car. Transcripts of these recordings were prepared by a certified shorthand reporter connected with the sheriff's office and these were produced at the trial. The recording of a conversation on June 7th was played to the jury upon the motion of the defendants. Those of July 11th and July 26th were played on the motion of the People, but over objection of defendants. When one of the records was played the court interrupted for the reason that the projection was unintelligible. This led to the production of copies of the transcriptions for the use of the jurors as they listened to the playing of the records. These were handed to the jurors solely for use during the playing of the records and to aid in their understanding of the same. As soon as the records had been played the transcriptions were taken from the jurors and were not used otherwise, nor again, except upon an occasion when the jurors, during their deliberations, requested the replaying of the records. It appeared from the transcriptions and also from the playing of the records that there were some passages which were unintelligible. Defendants objected to the playing of the records upon the ground that they were incomplete and that there was insufficient foundation laid for their use. The objections were overruled and error is asserted. Jordan testified that when the recorded conversations were fresh in his mind he had heard the records played, had read the transcriptions, and that as he remembered the conversations, the statements that could be understood in the playing of the recordings, and the transcriptions, were accurate. There was other testimony to the same effect. The court ruled that in the absence of other evidence a sufficient foundation had been laid for the use of the recordings. Later in the case the defendants testified that the recordings were incomplete, which fact was uncontroverted. But nowhere in the record does it appear that there was testimony that any statement heard in

the playing of the records was a misstatement of what had been said, nor was there evidence of any material statement that had been made during the conversations which was not recorded and transmitted intelligibly. Many statements that were recorded were of no materiality whatever and these were quite properly omitted in the testimony of the witnesses.

It is also urged that the use by the jurors of the transcriptions was error for the reason that it tended to emphasize and impress on their minds statements of defendants which tended to incriminate them.

The logical way to lay a foundation for the playing of the recordings of the conversations was for a participant in the conversations to listen to the recordings and to state whether, according to his recollection, the conversations were truthfully recorded. This procedure was followed by the court and we think it was adequate. There can be no doubt that before permitting recordings to be played to the jury the court should satisfy itself that they are substantially complete and substantially correct as to matters that are material and important. It is a matter that must be left to the discretion of the court. The playing of the records was found by the court to be difficult to understand and unsatisfactory. The important thing was that the jurors should be enabled to understand them. The transcriptions had been prepared by an expert and were used for a proper purpose.

It is clear, moreover, that defendants suffered no prejudice through the playing of the records or the use of the transcriptions. In fact, there was little need for using them, although this was not known at the time they were made use of. We have said that the transcriptions were not shown to be false in any particular with respect to the statements that were recorded. This is borne out by the testimony of the defendants. The only portions of the recordings and the transcriptions which tended to inculpate the defendants were of statements to which the defendants, themselves, testified. In the recording of the June 7th conversation, which took place while Jordan and Dr. Garland were seated in Jordan's car and Thiele was engaging them in conversation, Dr. Garland was explaining to Thiele that he had not been making any money; Thiele stated that as long as he was not making any money he would not be bothered, but that if he got to making money and did not report it to Thiele that he (Thiele) would be very unhappy about it. Garland said that he had

only $150, that he would give it to Thiele and more later, but Thiele told him to "hang on to it." Jordan said "How about the $400 deal with Garland" and Thiele said that that could be worked out when Garland got back to work and started doing something, but he admonished Garland not to get caught. Thiele not only testified to substantially the same facts, but he also testified that at the June 7th meeting he and Jordan walked away from the car, Jordan said he needed the money, Thiele told Garland to give Jordan the money, which Garland did, and Jordan gave it to Thiele; that he returned $30 of it to Jordan and gave $30 to Finch the following day.

The July 11th recording was of a conversation between Henry, Jordan and Thiele, which took place in a police car in front of the home of a friend of Thiele's. Someone asked "Is it all there?" and Henry answered "400 there." Thiele asked "going to split it five ways, aren't we?" and Henry said "Right, five ways — just like usual. We got to cut Captain Martin in, got to cut Harry in." Thiele gave Jordan "five" (apparently $20 bills), but took back one. There was also some discussion of "the old man" (evidently Garland). Thiele testified to the receipt of $400 upon that occasion and to having given $80 to Jordan and $80 to Henry.

Although the recordings clearly disclosed that the participants were dividing money that had been received from Garland, that fact was freely admitted by the four officers, with the explanation by each pair of participants that they were acting solely to entrap the other, in the interests of law enforcement. We find no error or abuse of discretion in the playing of the records or use of the transcriptions. (See *People* v. *Wojahn,* 169 Cal.App.2d 135 [337 P.2d 192].)

▉ Error is assigned in the admission, over defendants' objection, of a three-page report prepared by Henry, at the request of Lieutenant Black, recording the development of the Garland affair. Black asked Henry for a report shortly after having been informed of the occurrences on and about February 8th. Henry prepared a report February 16th and gave it to Black on the following day. Black kept the report in confidence until he gave it to Chief Mooney about May 5th. Captain Bowers of the sheriff's office was informed and as a result the report was shown by Mooney to Deputy Sheriff Brooks.

The portion of the report which related to the demands

made upon Dr. Garland by Jordan covered the proposal by defendants to Jordan on February 8th that Garland be told that he would be expected to pay $400 per month for protection. The report covered Jordan's conveying the message to Garland that Thiele and Finch threatened that if he did not cooperate they would "set him up" for abortion, as they had done before; that Garland agreed to cooperate and try to pay $400 per month; Jordan and Henry informed Lieutenant Black of the foregoing and were instructed to "play along" and keep him advised, and to return to Garland any sums they received from him; February 11th, Garland gave Jordan $400; the money was given to Thiele at the Detective Bureau in the presence of Finch; Thiele went into Captain Martin's office and then Thiele and Finch left the building; February 16th, Thiele gave Jordan $150, which Jordan returned to Garland. It was stated that all these occurrences were reported to Lieutenant Black. The report also mentioned statements of Garland with respect to his prosecution for abortion in 1957 and payment of a bribe.

In the People's case the Henry report was received for identification and was used in the cross-examination of Henry and Black. It was offered in evidence by the People after the defense was closed, for the limited purpose of meeting any claim that the testimony of Jordan and Henry, which implicated defendants as conspirators in the demands made upon Garland, was a recent fabrication. Over defendants' objection the report was admitted for the limited purpose for which it was offered.

The theory of the defense was that Jordan and Henry had been extorting money from Garland, and that when they became fearful their offenses had been discovered they decided to accuse defendants as the real culprits and to pose, themselves, as feigned accomplices, and thus obtain immunity.

There was evidence of certain additional incidents which had a bearing upon the theory of the defense. Henry testified that about April 26th, in a bar, Finch handed him $50, asking him whether he wanted to make some money, mentioning the Garland matter. Finch's version of the transaction was that he contacted Henry to find out whether he and Jordan were taking money from Garland. He and Thiele got Henry drunk and he admitted to them that he and Jordan had been taking money from Garland, and he gave Finch $50, which Finch promptly returned to him. It was then that Henry and Jordan proposed that Finch and Thiele join with them in mak-

ing demands upon Garland, and that they decided to go along as ostensible participants. May 5th, Mooney replaced Dovey as chief of police. A few days later Jordan and Henry met with representatives of the sheriff's force, a deputy district attorney and Lieutenant Black. Thereafter, operations were carried on under the direction of these officers.

When Thiele was questioned as to what he believed had led to the charges against himself and Finch he answered that he believed that Jordan and Henry had become fearful that their actions had become known to Black and Mooney, or some other law enforcement agency, and that in order to obtain immunity they conceived the plan to accuse Finch and Thiele as the real offenders, and to represent themselves as only feigned accomplices. Thiele also suggested that Henry's report might have been written in May, at about the time of the conference of the officers, who met on May 7th.

Thiele's statement of his belief that Jordan and Henry, fearing their crimes had been discovered, decided to shift the blame to defendants in order to obtain immunity for themselves, expressed the entire theory of the defense which was, of itself, an accusation that Jordan and Henry engaged in a program of deceit and falsehood which culminated in the testimony they gave at the trial.

The situation was clearly one in which evidence may be received to meet the charge that the testimony given by a witness was a recent fabrication. The rule is stated in *People* v. *Vera,* 145 Cal.App.2d 649 [302 P.2d 887].

It may be noted that while counsel for defendants assert error in the admission of Exhibit 6 they do not question that the rule was correctly interpreted by the trial court nor do they point out any insufficiency of facts to justify its application in the present case.

██ Defendants' final contention is that the judgments subject them to double punishment in violation of section 654 of the Penal Code. They maintain that the acts which constituted the substantive offenses are inseparable from and in fact are the same acts which were involved in the crime of conspiracy, and that they cannot be punished for both crimes. The contention is sustainable.

The acts which were alleged as the basis of the substantive offenses charged in counts V to IX, inclusive, were alleged to be overt acts committed pursuant to and to effect the objects of the conspiracy. Each defendant was a principal in each substantive offense by virtue of the unlawful agreement

to commit and join in the commission of the same. Although each advised and encouraged the commission of each offense and was a principal under section 31 of the Penal Code, the purpose of this participation was to accomplish the objects of the conspiracy. The series of acts, while separable from each other as to the substantive offenses, were inseparable from the conspiracy itself. *People* v. *Keller*, 212 Cal.App.2d 210 [27 Cal.Rptr. 805], is decisive of the point. The crimes there charged were conspiracy to commit burglary and attempted burglary. There was but a single purpose, namely, commission of a burglary. The opinion states: ''Since the conspiracy was not shown to have any objective apart from that involved in the attempted burglary, the 'one objective' test forbids double punishment. The sentence for the lesser offense (the attempt) must be set aside.''

Defendants stand convicted of conspiracy to ask for, agree to receive and receive bribes and to commit extortion. Under section 182 conspiracy to commit bribery carries the punishment as for bribery under section 68 of the Penal Code of 1 to 14 years. Conspiracy to commit extortion carries the punishment prescribed for extortion (Pen. Code, § 520) of 1 to 10 years. Solicitation of the commission of each separate crime as charged in counts V to IX, inclusive, carries punishment under section 653f of from 1 to 5 years. Since the punishment prescribed for the offense of conspiracy is in excess of the punishment prescribed for solicitation under each of counts V to IX, inclusive, the sentence imposed under count X, conspiracy, must stand and the sentences imposed under each of counts V to IX, inclusive, must be vacated.

The judgments are affirmed as to count X and are reversed insofar as they impose punishment for the offenses of solicitation under counts V to IX, inclusive.

Ford, J., and Files, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 17, 1963.