[Crim. No. 1397. Fifth Dist. Nov. 20, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
BILLY CHARLES FONVILLE, Defendant and Appellant.

694

696

---

---

## COUNSEL

David L. Skinner, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Eddie T. Keller and Kevin Corrington, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BROWN (G. A.), P. J.**—After a 13-day trial a jury found the appellant guilty of murder in the first degree (Pen. Code, § 187), found him sane in a subsequent sanity trial lasting 2 days, and in a 5-day penalty trial fixed the penalty at death.

Under the mandate of *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], we are required to modify the judgment to provide for a punishment of life imprisonment; for the reasons hereinafter stated the judgment will otherwise be affirmed.

Appellant's core contention is that as a matter of law the first degree murder conviction cannot stand because there is not substantial evidence to support the jury's determination that the murder was committed with premeditation and deliberation. Appellant asks this court to reduce the degree of the crime to second degree. (Pen. Code, § 1181, subd. 6; *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942].) Supportive of this contention he introduced evidence in the trial court and argued before the trial court and in this court that due to appellant's ingestion of drugs and alcohol and due to mental illness he did not have the capacity to act with premeditation and the deliberation required for first degree murder (Pen. Code, § 189) or to form the necessary intent to commit robbery.

In this connection we observe initially that the case was tried both on the theory of a "willful, deliberate and premeditated killing" (Pen. Code, § 189) and on the felony (robbery) murder doctrine, requiring only the necessary mental capacity to form the specific intent to commit robbery.

Appellant also seeks reversal of the judgment and a new trial on a second ground: that the trial court improperly permitted the playing of a surreptitiously recorded jail conversation between the appellant and his uncle.

On January 19, 1971, Jancinto Corpuz, a male of Filipino extraction, was the victim of a homicide. There is no substantial conflict in the evidence with respect to the occurrence of the events leading up to his death.

On that evening, at approximately 9 to 9:30 p.m., the appellant and Ruth Mae Rowland, his 17-year old associate, and the victim were at the Lamont Cafe (also known as Alice's Cafe) in Lamont, California. While seated together, the appellant persuaded Mrs. Rowland to have intercourse with the victim for $20. Appellant thereafter, out of the presence of the

victim, indicated to her that she need not actually have intercourse with the victim but only go out with him, whereupon appellant would "roll" or rob the victim for money. The victim then left the cafe to obtain money from his car to pay appellant. During his absence appellant approached John Doctolera, who was working at the cafe, and asked for a club or a gun in order to roll the victim for $300. Mr. Doctolera stated to the appellant, "You don't need to kill anyone," and did not produce the requested weapons, whereupon appellant replied, "You are right." Also while at the cafe the appellant stated to one Kenneth George Claunch that he was going to rob and kill the victim.

After the exchange of money between appellant and the victim, the appellant, Mrs. Rowland and the victim left the cafe. Mrs. Alice Doctolera, realizing what was going to happen, attempted to keep the victim from going with the appellant and Mrs. Rowland by pulling him back into the cafe and trying to divert his attention by offering to sell him a watch and by other stratagems. Nevertheless, appellant finally succeeded in getting the victim out of the cafe by telling him, "Come on, let's go," and grabbing hold of his hand.

Appellant, Mrs. Rowland, and the victim then got into the victim's car and left. The victim drove out of town for some distance, whereupon appellant took over at the wheel and drove the car off the road into a field and stopped.

After exiting the car the appellant told the victim to get out and said, "Let's fuck him." When the victim was outside the car, appellant started to hit him with his fists. The victim pleaded with appellant to stop hitting him, but appellant persisted, mimicking the victim's Filipino accent. Appellant told Mrs. Rowland to find things for appellant to hit the victim with, and in compliance she gave him a thermos bottle that appellant used to strike the victim on the head. She then gave him a screwdriver which appellant used to hit the victim in the stomach. Appellant stated to Mrs. Rowland that, "This wouldn't do it," and told her to find something else. She then produced a sharp foot-long object, and she held the victim's head while the appellant hit him on the head with the weapon. When the victim was unconscious, appellant removed the victim's wallet, money and key chain from him and looked into the trunk, glove compartment and under the seat of the car for money. The wallet, key chain, screwdriver and sharp object were put into Mrs. Rowland's purse. Thereupon appellant and Mrs. Rowland got back into the car and the appellant drove it back and forth over the victim's body two or three times.

Appellant and Mrs. Rowland then drove to the house of appellant's cousin, Ricky Fonville. When Ricky came out of the house appellant said, "Hurry up, I just killed somebody," or something like that. Ricky Fonville then got in his car and followed appellant and Mrs. Rowland to a canal. At Mrs. Rowland's suggestion, appellant attempted to wipe off the fingerprints in the victim's car with a blanket, and the car was then pushed into the canal.

Ricky Fonville drove the appellant and Mrs. Rowland back to Alice's cafe. While at the cafe Shirley Mahan, a waitress at the cafe, noticed blood on the appellant's shirt and asked what had happened. He replied that he thought he had killed a guy. Alice Doctolera also noticed blood on appellant's shirt and pants and noticed that appellant and Mrs. Rowland were looking back and forth at each other and then would look at her. She asked if anything was wrong, whereupon appellant replied, "Yes, I think I just killed that little guy." Sometime later appellant stated that he had only been teasing.

Shortly thereafter appellant and Mrs. Rowland left the cafe. The appellant asked Mrs. Rowland to get rid of the screwdriver, the sharp object, the key chain and the wallet, whereupon Mrs. Rowland told him he would have to get rid of those items himself and gave them to him.

Due to the heavy responsibility placed upon this court in reviewing a first degree murder conviction and the meticulous scrutiny with which we must examine the record when the defense is that of insufficiency of the evidence to support the trial court's finding that an appellant was not suffering from diminished capacity (see authorities *infra*), we summarize the evidence on this issue in some detail.

There is substantial conflict in the evidence as to whether the appellant was suffering from diminished capacity due to intoxication or mental illness. Vera Mardis, appellant's grandmother, testified that on the morning of January 19, at about 9 a.m., she saw appellant and noticed that appellant appeared strange and unusual, that his eyes were dilated, and that he was highly nervous, staggering a little and running into things. She said he wasn't acting naturally and that his hands were shaky and his speech was slurred.

Eva Kilium testified that she saw the appellant between noon and 4 or 5 p.m. on the day in question and that he was restless, talking all the time, was not making any sense, and was acting the way people act who are under the influence of drugs.

Appellant's cousin, Ricky Fonville, testified that on the afternoon of the 19th he and the appellant, along with two women, consumed more than two-fifths of whiskey and that he and appellant also consumed a six-pack of beer. He testified further that appellant's condition was "feeling pretty good," but that he was not "real sloppy drunk." That appellant was stuttering and slurring his words and was "goofier than hell." He also said that after 5:30 p.m. he believes appellant took three or four reds, but he didn't actually see him put them in his mouth. He said that the appellant also had two or three beers to drink at Alice's Cafe. Ricky Fonville also testified that the appellant returned to his house on the night of the event and slept there all night. When they got up the next morning he noticed blood on the appellant's clothing. The appellant said he must have gotten into a fight the night before but he couldn't remember that or how he got into Ricky's house. Later that morning they saw on television that a man had been killed, and when he asked the appellant about it the first time the appellant said he didn't remember, and then later he remembered something about running over someone.

Virginia White, appellant's former wife, testified that she saw appellant about 6 p.m. on the evening of the murder and that he was "funny acting" and "he had a funny look out of his eyes as if—was kind of far away glassy type look," and that he was acting so strangely that she left her house until after he left because she was afraid of him.

Contradicting this testimony was that of four witnesses who observed the appellant that evening at the cafe near the time of the crime, including Mrs. Rowland, who testified on behalf of the prosecution.

Mrs. Rowland said that she had seen appellant on various occasions under the influence of alcohol and drugs and was of the opinion that on that particular night appellant did not appear to be under the influence of either.

John Doctolera, at Alice's Cafe, who had known appellant for some time, was of the opinion that he was not intoxicated while at the cafe just prior to the murder.

Shirley Mahan, a waitress at the cafe, saw appellant before he left the cafe and after he returned. She did not think appellant was drunk and did not see him stagger or have any difficulty walking or speaking.

Alice Doctolera was familiar with appellant and did not notice any difference in his manner or speech or that he had any difficulty in walking.

One psychologist, Dr. Wesley Sanderson, and one psychiatrist, Dr. James Peale, testified on behalf of appellant. Two psychiatrists, Dr. Francis Anthony Matychowiak and Dr. Phillip L. Kelly, Jr., testified on behalf of the prosecution.

The psychologist, Dr. Sanderson, administered a number of psychological tests to the appellant. He testified that the appellant told him that he had taken six or eight reds on the night in question, that he and two other persons drank two-fifths of whiskey, and also that he had injected some "speed." Dr. Sanderson said that if appellant consumed as many intoxicants as he said he had it would have been obvious to an observer. He further testified that appellant had an explosive or sociopathic personality disorder in conjunction with an underlying paranoid schizophrenic reaction that breaks through in times of stress, and that appellant's use of drugs and alcohol increased the potential for such breakthroughs. He concluded that if appellant had consumed the amount of intoxicants that he stated, his ability to premeditate and deliberate or to intend to commit murder or robbery would be substantially diminished. He did not say whether that capacity would have been diminished without the consumption of the intoxicants.

Dr. Peale testified that appellant told him he was unsure of how many reds he had taken that day, but it was at least "a couple" in the morning. According to Dr. Peale, appellant had also stated that he was among four people who participated in the consumption of two-fifths of whiskey over a four-hour period and then appellant and his cousin drank another fifth of whiskey together and that appellant also drank several beers that day. He said that if appellant consumed as many intoxicants as alleged it would not necessarily have been obvious to an untrained observer. Dr. Peale portrayed appellant as having a schizophrenic reaction, paranoid-type, which has existed for a number of years with periods of remission and exacerbation, and that appellant had an acute brain syndrome arising out of multiple head injuries which would be aggravated by alcohol and drugs. He obtained a history from appellant of multiple head injuries, the most recent occurring about six months before the murder, when he was knocked unconscious with a cue stick. The history taken from appellant also showed that ever since he was two to four years old he had several head injuries and these, coupled with drugs and alcohol, predisposed him to an organic toxic state. At about the age of six he was hit on the head with an ax handle and knocked unconscious. At 12 he was hit by a car and knocked "crazy." After the age of about 14 he was frequently knocked out in fist fights with his father. He had a history of seizures during which he would

be unconscious, and he would have periods in which he would think he was one place and find himself someplace else. He said he had spells in which he had bitten his tongue and his lips.

The information on head injuries and the amount of alcohol and drugs consumed by appellant was derived solely from appellant's statements. Dr. Peale's diagnosis of brain syndrome was arrived at by means of a clinical judgment based on the history of injuries related by the patient, unverified from any independent source. Dr. Peale had access to an EEG that had been taken by another person which Dr. Peale testified was normal.

Dr. Peale concluded that if appellant consumed the amount of intoxicants alleged he would have been unable to form the intent to rob or kill and could not plan anything. He was unable to state what such capacity would be if these intoxicants had not been ingested.

Dr. Matychowiak said in his report that the appellant was unsure of how many reds he had taken that night, though he thought it was 8 or 10 inasmuch as he had that many in his possession earlier in the day and he had none in his possession the next morning. He also testified that during his interview the appellant did not say that he had consumed any alcohol that night, although the doctor specifically asked him what he had taken. He depicted the appellant as being of average intelligence and in good contact with reality, though having generally poor judgment. He characterized the appellant's psychiatric condition as sociopathic personality disturbance, dissocial type. He stated that in the absence of intoxicants the appellant could form the intent to rob or kill and could premeditate, deliberate, and harbor malice aforethought; assuming that appellant's normal amount of pills per day was consumed on the day of the murder, which would have been four reds as described by appellant to the doctor, the doctor concluded that appellant would still have such capacity and that the ingestion of that quantity would not eliminate the ability to form intent though it would make him less likely to use good judgment.

The doctor said that assuming the appellant consumed a fifth of whiskey and three beers and no reds at all over a two to two and one-half hour period he would be "out cold," could not walk normally and would be obviously intoxicated.

The appellant gave Dr. Matychowiak no history of seizures or unconsciousness. He said that the tests administered by Dr. Sanderson and the EEG test were insufficient to support a diagnosis of acute or chronic brain syndrome, as was testified to by Dr. Peale.

Dr. Kelly said that appellant related to him that he took three reds that night, and then later stated he had 14 in his possession when he left the cafe and none the next morning, thus inferring that he took all 14 that night. Dr. Kelly also indicated that the appellant had only mentioned drinking some beer on the night in question and said nothing about whiskey. He described the appellant's mental condition as passive-aggressive personality disorder with no evidence of psychosis or neurosis. He portrayed him as well oriented and as showing no thought disorders, as not delusional, as having a 90 IQ which is within normal range, and as having no chronic brain syndrome. The doctor concluded that the appellant did not have any mental condition that would preclude him from harboring an intent to rob or to kill with malice aforethought and with premeditation and deliberation.

In a recorded statement given to the police which was played to the jury, the appellant said that he had taken about 15 reds on the day of the crime.

We delineate the applicable principles of law: " ' "It has long been settled under the *Wells-Gorshen* rule of diminished capacity that in cases other than those where a felony murder is charged, a defendant cannot be convicted of murder of the first degree if, at the time of the alleged offense, he was operating under a mental disability not amounting to legal insanity that prevented him from acting with malice aforethought or with premeditation and deliberation." ' [Citations.]" (*People* v. *Sirhan* (1972) 7 Cal.3d 710, 726-727 [102 Cal.Rptr. 385, 497 P.2d 1121], cert. den., 410 U.S. 947 [35 L.Ed.2d 613, 93 S.Ct. 1382].)

In reviewing a first degree murder conviction based on the theory of premeditation and deliberation where it is contended the fact finder's determination of the degree of the murder is not supported by substantial evidence and the defense is based on diminished capacity, appellate scrutiny of the record is more rigorous and more intense. ■ As was recently explicated in *People* v. *Smith* (1973) 33 Cal.App.3d 51, at pages 62-63 [108 Cal.Rptr. 698]: "In conventional appellate review the function 'begins and ends' with the discovery of substantial evidence supporting the verdict. [Citation.] The task is relatively passive, relatively one-sided, fulfilled when the prosecution evidence turns out to be 'reasonable in nature, credible, and of solid value; . . .' [Citation.] In the review of first degree murder verdicts (especially when featured by possibilities of diminished capacity) the substantial evidence formulation persists, but the appellate role is more intense, more active. Appellate duty is not satisfied, in the

latter case, when substantial evidence emerges on one side. Rather, the judges must look to the evidence on both sides and not limit their scrutiny to that supporting the verdict. As *Bassett,* 69 Cal.2d at page 138, puts the matter, the reviewing court looks at 'the entire picture of the defendant put before the jury. . . .' The appellate judges must examine the evidence for and against premeditation and weigh it in the balance. Their objective is not to replace the jury but to satisfy themselves that the verdict is reasonable. If it is it should stand, even though a verdict of lesser crime is equally reasonable. 'This appraisal (of premeditated murder) is primarily a jury function and within a wide field of discretion its determination is final.' [Citation.]" (See *People* v. *Bassett* (1968) 69 Cal.2d 122 [70 Cal. Rptr. 193, 443 P.2d 777]; *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942]; *People* v. *Holt* (1944) 25 Cal.2d 59 [153 P.2d 51].)

■ We also are cognizant that there must be a somewhat higher degree of personal turpitude than that required by specific intent in order to comply with the statutory statement of "willful, deliberate, and premeditated. . . ." (Pen. Code, § 189.) "The difference between first and second degree murder is basically one of the quantum of the personal turpitude of the offender. This quantum is, however, measured by the character of the particular homicide involved. [Citation.] By conjoining the words '. . . [willful], deliberate and premeditated' in the statutory definition of murder of the first degree, the Legislature apparently intended to require as an element of this crime, 'substantially more reflection than may be involved in the mere formation of a specific intent to kill.' [Citation.]

"The test of such reflection in a case where the defendant may have a diminished capacity must include consideration of the somewhat limited extent to which such a defendant could *maturely and meaningfully reflect* upon the gravity of his contemplated act. [Citation.] Where the defendant 'is not a fully normal or mature, mentally well person' and the extent of his understanding, reflection upon and comprehension of the crime and its consequences, with realization of the enormity of the evil involved, appears to have been materially 'vague and detached' he can be guilty of no more than second degree murder. [Citation.]" (*People* v. *Caylor* (1968) 259 Cal.App.2d 191, 203-204 [66 Cal.Rptr. 448].) (See *People* v. *Wolff* (1964) 61 Cal.2d 795, 821-822 [40 Cal.Rptr. 271, 394 P.2d 959]; *People* v. *Sirhan, supra,* 7 Cal.3d 710, 727-728.)

■ The substantial evidence to support the fact finder's determination of premeditation and deliberation is to be gleaned from all of the record,

direct and circumstantial, as well as psychiatric and psychological evidence, and not from expert evidence alone. As was said in *People* v. *Smith, supra,* 33 Cal.App.3d 51, at page 63: "Here, where both expert testimony and circumstantial evidence bear upon the defendant's capacity to premeditate and harbor malice, we discern no mandate to consider anything but the entire body of evidence."

Appellant contends serious error was committed because neither of the prosecution's experts, Dr. Matychowiak or Dr. Kelly, was asked the exact question, "To what extent could the defendant maturely and meaningfully reflect upon the gravity of his contemplated act?" There was no error. This question need not be asked or answered. A similar contention was made and flatly rejected by the Supreme Court in *In re Kemp* (1969) 1 Cal.3d 190, 195 [81 Cal.Rptr. 609, 460 P.2d 481]. For similar reasons appellant's argument that the jury should have been instructed that such testimony was required is without merit. (*People* v. *Smith, supra,* 33 Cal.App. 3d 51, 64, fn. 5.) The jury was properly and fully instructed on the nature and extent of the reflection required to constitute premeditation and deliberation in the language of CALJIC No. 8.20.

■ As we have mentioned, there was a lively conflict in the evidence with respect to whether appellant was intoxicated. The defense psychiatrists in the main based their conclusions upon the assumption that he was intoxicated. If he was not intoxicated the substructure supporting their opinions falls and the validity of their opinions is necessarily open to question. It is axiomatic that the opinion of an expert is no better than the reasons upon which it is based. In light of the substantial conflict on this issue, the jury was, under the evidence, entitled to believe he was not intoxicated and to discount the expert opinions accordingly.

Dr. Peale's diagnosis of acute chronic brain syndrome from head injuries was based exclusively upon the appellant's statements given to Dr. Peale. It was a clinical diagnosis, unverified or uncorroborated from any independent source; the EEG being normal and Dr. Matychowiak's testimony that Dr. Sanderson's tests were insufficient to establish such a diagnosis, coupled with the failure of the appellant to tell the prosecution experts of those injuries, entitled the jury to discount the seriousness of these injuries, if they in fact occurred. We reiterate that if the supportive evidence forming the underpinnings for the expert's conclusion is disbelieved, the opinion carries no weight.

Applying the stringent standards we have set forth, we are satisfied upon a review of all the evidence, including, among other things, the expert

testimony and the proof of the conduct, statements and admissions of the appellant and other circumstances surrounding the crime, that the jury's conclusion that appellant was not suffering from diminished capacity was reasonable (*People* v. *Kunkin* (1973) 9 Cal.3d 245, 250 [107 Cal.Rptr. 184, 507 P.2d 1392]) and the prosecution sustained its burden of proving the appellant guilty beyond a reasonable doubt. (*People* v. *Bassett, supra,* 69 Cal.2d 122, 139; see also *In re Kemp, supra,* 1 Cal.3d 190, 195; *People* v. *Risenhoover* (1968) 70 Cal.2d 39, 51-52 [73 Cal.Rptr. 533, 447 P.2d 925], cert. den. 396 U.S. 857 [24 L.Ed.2d 108, 90 S.Ct. 123].)

Moreover, the first degree murder verdict is irrefragably supportable on the felony-murder theory that the killing took place during the perpetration of a robbery. On this theory the People need only prove the specific intent required by the underlying felony (robbery, Pen. Code, § 211) and that the homicide occurred in the perpetration of that underlying felony. (*People* v. *Risenhoover, supra,* 70 Cal.2d 39, 50.) In this respect the evidence on diminished capacity is directed to the narrow issue of specific intent to rob rather than to the concepts of malice aforethought and willful, deliberate and premeditated killing, the applicability of the evidence in the two situations is not equivalent or comparable (*People* v. *Ireland* (1969) 70 Cal.2d 522, 539, fn. 13 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]), and appellate scrutiny of the evidence—direct, expert and circumstantial —is far less severe in determining the sufficiency thereof to support the jury's finding of such specific intent. (*People* v. *Earl* (1973) 29 Cal.App.3d 894, 897-898 [105 Cal.Rptr. 831]; *People* v. *Johnson* (1972) 28 Cal. App.3d 653, 657-658 [104 Cal.Rptr. 807]; *People* v. *Rhodes* (1971) 21 Cal.App.3d 10, 22-23 [98 Cal.Rptr. 249].)

In the case at bench the recited evidence was patently sufficient to support the finding by the jury of such specific intent to rob, unimpaired by any claimed diminished capacity.

■ Appellant seeks reversal of the judgment because the court permitted the introduction of the following surreptitiously recorded jail conversation between appellant and his uncle during a visit by the uncle to appellant at the Kern County jail on February 10, 1971:

"UNCLE: Have you denied anything or anything?

"BILLY: I denied the whole son-of-a-bitching thing. Told them I was tanked up on pills, drunk, stuff, didn't know what was going on. Told them I didn't remember a [g]od-damned thing about it.

"UNCLE: Well, shit, that's what you get for taking them damn pills.

"BILLY: Oh, I remember it, but I just told them I didn't, see. I don't know what else to tell them. Shit, I done took 12 or 14 reds that night.

"UNCLE: Well, I know. I know they said that—Nita said that—

"BILLY: I remember part of it, I remember, first part, you know, leaving the cafe, then after we left the cafe, I don't remember what happened."

Appellant's contention that the recording violated his constitutional rights is without merit. Not only was there no objection in the trial court, precluding him from raising the point on appeal (*People* v. *Gallegos* (1971) 4 Cal.3d 242, 249-250 [93 Cal.Rptr. 229, 481 P.2d 237]), but it is well settled that, with limited exceptions, none of which is present here, a prisoner has no reasonable expectation of privacy with respect to his oral communications within a jail facility. (*Halpin* v. *Superior Court* (1972) 6 Cal.3d 885, 900, fn. 21 [101 Cal.Rptr. 375, 495 P.2d 1295], cert. den., 409 U.S. 982 [34 L.Ed.2d 246, 93 S.Ct. 318]; *North* v. *Superior Court* (1972) 8 Cal.3d 301, 310-311 [104 Cal.Rptr. 833, 502 P.2d 1305]; *In re Joseph A.* (1973) 30 Cal.App.3d 880, 883-886 [106 Cal.Rptr. 729]; *People* v. *Finchum* (1973) 33 Cal.App.3d 787 [109 Cal.Rptr. 319].)

Appellant urges that a reversal is called for because the prosecution did not make known the existence of the tape until the trial was in progress, although a discovery order had ordered the district attorney to turn over all relevant materials long before trial. The delay in disclosing the existence of the tape until the trial was grossly improper (*People* v. *Campbell* (1972) 27 Cal.App.3d 849, 858 [104 Cal.Rptr. 118]) and we do not approve or condone such conduct on the part of the prosecution.

However, appellant did not object to the admission of the tape on the ground that the discovery order had been violated but only on the basis that an improper foundation had been laid, in that the authenticity of the tape had not been established. The failure to object precludes raising this issue on appeal. (Evid. Code, § 353; *People* v. *Filcher* (1959) 169 Cal. App.2d 651, 654 [337 P.2d 588].)

Further, the failure to produce the tape did not deprive appellant of a fair trial. The day prior to the introduction of the tape recording the prosecution presented the tape to the court in chambers. The court and counsel listened to the tape three times. When the court adjourned for the day counsel for appellant was permitted to remain and listen to the recording that evening and the court provided a technician to operate the machine. The next day appellant requested other parts of the tape be introduced. The court ordered that the portions of the tape which appellant

requested be introduced along with that introduced by the prosecution. The parts introduced at appellant's request were those segments wherein the appellant after admitting to his uncle that he did remember the events of the night of the crime seemed to controvert that admission. Appellant made no request for a continuance to further prepare or to call additional witnesses.

Under these facts the admission of the tape after the delay in disclosing it pursuant to the discovery order was not prejudicial error in view of the nature of the tape and in light of the appellant having been given adequate opportunity to review it and to call additional witnesses if he desired. (*People* v. *McManis* (1972) 26 Cal.App.3d 608, 617-619 [102 Cal.Rptr. 889].)

■ Lastly, appellant argues that there was an insufficient foundation for the admission of the tape because there was no evidence that the recording was an accurate reproduction of the conversation and there was no evidence as to the identification of the voices on the recording.

The following foundational evidence was introduced: The jail division of the Kern County Sheriff's office took the request of the district attorney to record appellant's conversation. When appellant's uncle arrived at the jail his name, address and relationship to appellant were taken. Appellant and his uncle were assigned to phone No. 30, which was part of the intercom-type phone setup in the visiting area, which enabled the two to converse while remaining separated by a glass partition. The jail personnel then notified the recording room that appellant would be on phone No. 30 shortly and to record the conversation in accordance with the prior instructions. The conversation was then recorded by Ronald Goodwin of the Kern County Sheriff's office.

Neither Goodwin nor anyone else was called to identify the voices or to testify that the tape was an accurate reproduction of the conversation.

Undoubtedly the usual way of laying a foundation for the playing of a recording is to call one of the participants or a monitor to testify that the conversation was accurately recorded. (*People* v. *Finch* (1963) 216 Cal. App.2d 444, 452-454 [30 Cal.Rptr. 901], cert. den., 377 U.S. 990 [12 L.Ed.2d 1044, 84 S.Ct. 1907], rehg. den., 379 U.S. 871 [13 L.Ed.2d 77, 85 S.Ct 16].) However, it is clear that this method is not exclusive. Evidence Code section 250 defines a writing to include a tape recording. (See official comment to Evid. Code, § 250.) Under Evidence Code section 403, subdivision (a)(3), the preliminary fact of authentication is first determined

by the trial judge but it is subject to redetermination by the jury. (Evid. Code, § 403, subds. (a)(3), (c)(1), see official comment.)

Evidence Code sections 1410-1421 set forth numerous methods of establishing the authenticity of a writing. Section 1421 of the Evidence Code states: "A writing may be authenticated by evidence that the writing refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent of the evidence to be the author of the writing."

Applying this principle to the contents of the recorded conversation, it would appear that the statements regarding what had been denied to the police, what had been told to the police regarding the declarant's state of intoxication, quantity of intoxicants taken, and when the decedent had left the cafe, indicate that it was in fact appellant whose words were on the recording. They are matters that are unlikely to have been known by anyone other than the appellant. In effect, the conversation proves itself.

As to the identification of appellant's voice, both the judge and the trial jury had heard appellant's recorded statement of January 25, 1971 (a statement that had been made to the police on the night of the arrest and was properly admitted) immediately before hearing the surreptitiously recorded statement of February 10, 1971, and by comparison had a basis for authenticating the fact that appellant's voice was on both tapes. There are other ways of identifying a voice than by seeing the speaker (*People* v. *Sica* (1952) 112 Cal.App.2d 574, 588 [247 P.2d 72], cert. den., 346 U.S. 831 [98 L.Ed. 354, 74 S.Ct. 36]; *People* v. *Rosoto* (1962) 58 Cal.2d 304, 335 [23 Cal.Rptr. 779, 373 P.2d 867], cert. den., 372 U.S. 952, 955 [9 L.Ed.2d 977, 83 S.Ct. 950]), and we have concluded that comparing the two tapes is one such acceptable method.

We therefore conclude that from the evidence surrounding the introduction of the tape, the contents of the conversation recorded thereon and the opportunity for the judge and the jury to compare appellant's voice on the two tapes, a sufficient foundation was established.

The judgment is modified to provide a punishment of life imprisonment instead of death, and as so modified the judgment is affirmed.

Gargano, J., and Franson, J., concurred.