[Crim. No. 29951. Second Dist., Div. Five. May 2, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE LEE HENDERSON, Defendant and Appellant.

586

**COUNSEL**

Brian C. Lysaght, under appointment by the Supreme Court, and Robert C. Vanderet for Defendant and Appellant.

Paul Halvonik, State Public Defender, Charles M. Sevilla, Chief Assistant State Public Defender, Joseph Levin and Tracy S. Rich, Deputy State Public Defenders, James J. Brosnahan, Ephraim Margolin and Morton P. Cohen as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KAUS, P. J.—Murder for hire. Defendant Willie Lee Henderson and Mabel Glenn were charged with the murder of Edgar Glenn, Mabel's husband. The information alleged that the murder of Glenn was intentional and carried out by defendant pursuant to an agreement to accept valuable consideration for the act of murder. (Former Pen. Code, § 190.2, subd. (a).) Defendant's trial was severed from Mabel's and that of another codefendant. After a jury trial, defendant was found guilty of first degree murder. Later, the same jury found the alleged special circumstances to be true. In October 1975, the death penalty was imposed. In December 1976, the Supreme Court invalidated the death penalty statute (*Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101]) and transferred this appeal to us.[1]

### FACTS

The prosecution's theory was that defendant and Mabel Glenn had agreed to kill Edgar Glenn, and that defendant would receive one-half of the proceeds of Edgar's estate.

In early 1975, defendant asked Kirk Douglass whether Douglass would help defendant poison somebody. Defendant said the whole deal was worth $80,000 and Douglass agreed to participate. Defendant wanted Douglass to kill defendant's own wife. He took Douglass and Michael Steele to a school which his wife attended, as well as to her house. He wanted her shot. Douglass declined. Defendant wanted Douglass and Steele to burn down the house while his wife was inside. Nothing came of these discussions.

---

[1]Defendant Mabel Glenn was tried first and found guilty of first degree murder. The allegation of special circumstances was also found to be true. She too was sentenced to death. Also charged were Michael Steele and Kirk Douglass. Douglass agreed to testify against defendant in return for a reduction of the charge to second degree murder. Steele was charged and tried as a juvenile.

In February or March, 1975, Larry McElroy and defendant discussed killing defendant's wife. Defendant said if they killed her, there would be $2,000 of insurance, of which he offered McElroy half. He wanted her shot. Mabel Glenn was also present at this discussion. Defendant, McElroy and Mabel Glenn drove to defendant's wife's house. Defendant discussed how to get his wife outside of the house in order to shoot her. Later, Mabel Glenn said to McElroy, "I might have one for you to do later on." Again nothing came of defendant's plans to kill his wife.

The attention of the parties shifted to killing Mabel's husband, Edgar. McElroy decided against participating. He was, however, present when Mabel and defendant discussed poisoning Edgar. Mabel claimed that Edgar had $50,000 in insurance. After this discussion, defendant said to McElroy, "Later on, you know, we will knock old Mabel off." This would take place, defendant said, after they put some insurance on her. Defendant indicated to McElroy that it was "going to be more or less like an organized thing."

One time while Lee Tillery and defendant were at the liquor store, defendant asked Tillery if he had any poison. Tillery got defendant some silverfish poison from his house. Another time, when defendant was visiting Tillery with Mabel, defendant said, "We just going to run into a whole lot of money." Tillery thought defendant mentioned the figure of $80,000 and also thought that defendant told him he was "going to knock off some people."

In March 1975, defendant, Mabel, Steele and Douglass drove to Santa Maria to kill Edgar Glenn. Defendant claimed to have poison with him. On the way defendant and Mabel talked about money and what they would buy after the job was done. Mabel told Douglass that he would get his money and not to worry about it. Mabel left the group in Santa Maria after giving defendant a telephone number where she could be reached after the task was completed.

Defendant, Douglass and Steele went to Edgar Glenn's home. Defendant told Edgar he had a friend who lived in the neighborhood. Edgar asked defendant how he knew where Edgar lived and defendant told him some story. They sat around and started drinking. Edgar left the room for a minute. Defendant put some poison in a whiskey bottle, shook it up and set it on the table. Edgar returned to the room. After a few minutes defendant said they had to be going. Later Mabel picked them up and they drove back to Los Angeles.

A day or two later, defendant told Douglass they would have to go back to Santa Maria because the poison had not worked. Douglass was not sure about going back, but after defendant said he would be paid $20,000, Douglass agreed.

Defendant, Douglass, and Steele drove back to Santa Maria the following Friday. Douglass was reluctant, but defendant showed him a gun and knife and said, "This is why I know it will work for sure." When they arrived at Edgar's house, Edgar "acted kind of suspicious." He asked, "How come you keep running up here every other week," or words to that effect. Defendant made some excuse. They started drinking. Edgar said they did not have much to drink in the house and the four went to a liquor store. They returned to the house and resumed drinking. Defendant went into the kitchen and brought a skillet into the living room and put it behind the couch. Edgar was drunk and could hardly sit up. Defendant told Douglass to hit Edgar on the head with the skillet. Douglass did not remember whether he did so. Defendant took the skillet from Douglass and hit Edgar in the head until the handle broke. Steele stabbed Edgar a few times. Defendant took a gun he had with him, put a pillow over the victim's head, and shot him.

Defendant told Douglass to take Edgar's wallet to make it look like a robbery. The bedroom was ransacked. Defendant told Douglass to put into a bag all the evidence—glasses, ashtrays—indicating that they had been there. Defendant wiped off things they had touched. They returned to Los Angeles. On the way defendant opened the car door and threw the bag out. Douglass kept the gun and a bag full of bullets.

The day after the incident defendant and Mabel drove to Santa Maria, apparently so that Mabel could discover the body. She went to a neighbor's house and telephoned to say that Edgar had been found shot. A police officer who was dispatched to the residence found Edgar's body in the living room. The officer's testimony corroborated the events at the house as described by Douglass.

Eventually defendant, who had pretended to the police to be an aggrieved relative, was arrested. He was interrogated after being advised of and waiving his right to remain silent. Defendant offered several versions concerning the trip to Santa Maria. After the interrogating officer pointed out certain inaccuracies in his version, defendant agreed to tell the officer "a true version. . . ." This version generally agreed with that of Douglass. Defendant was questioned again several days later. This

confession generally tracked the earlier confession, with more details. In short, Mabel asked him to murder her husband for $10,000 and he agreed to do so. Douglass struck Edgar with the skillet, Steele stabbed him and defendant shot him.

The defense was diminished capacity.

## DISCUSSION

Defendant makes two contentions on appeal:

(1) His trial counsel was legally ineffective.

(2) The "death qualification" of jurors during voir dire denied him equal protection, due process and a fair trial.

### 1. *Ineffectiveness of Counsel*

Defendant points out that witnesses McElroy and Douglass were permitted to testify concerning "an alleged plot" to kill defendant's wife; that an objection to such evidence was made and overruled at the preliminary hearing; and that no objection was made at trial. Defendant contends that the evidence was inadmissible and that trial counsel was therefore legally ineffective.

■ The contention has no merit. The bare facts of Edgar's murder were hardly in issue. Trial counsel may well have felt that on the issue of diminished capacity the fact that defendant planned to kill not only Edgar Glenn, but also his own wife and even Mabel Glenn, reflected a diseased mind and therefore supported the defense of diminished capacity.[2]

■ Appellate counsel also points out that trial counsel failed to make a timely pretrial motion to suppress evidence of bullets which had been taken from Douglass' bedroom after the officers obtained consent to the search from his stepmother.

---

[2]Defendant did not testify. The defense consisted of expert and lay testimony to the effect that defendant was alcoholic, mentally retarded and emotionally disturbed. Defense counsel could certainly have concluded that a jury, listening to the narrative of events and then presented with the expert and lay defense testimony, would not believe that a person in his right mind would act in such a fashion.

When the defense objected to the admission of the bullets and the prosecutor countered by pointing out that there had been no pretrial motion to suppress, defense counsel, while admitting that the bullets were not "extremely crucial one way or the other, . . ." claimed that he "thought this evidence had been obtained as a result of a search warrant."

No reversible error is shown. First, we do not accept an off-hand, unsworn statement by trial counsel as establishing his lack of preparation. (*People* v. *Saidi-Tabatabai* (1970) 7 Cal.App.3d 981, 988 [86 Cal.Rptr. 866].) Second, as trial counsel realized, the bullets merely gilded the lily as far as the People's case is concerned.

### 2. *Death-qualification of Jury.*

Before trial, defendant moved the court for an order to preclude "anyone asking questions of prospective jurors on their attitude on the death penalty." The motion was supported by a lengthy written memorandum in which counsel claimed that a death-qualified jury was "prosecution prone." That proposition of course, had been rejected in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 517-518 [20 L.Ed.2d 776, 782, 88 S.Ct. 1770], on the ground that "[t]he data adduced by the petitioner, . . . are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt." In his moving papers below, defendant claimed that additional studies made since the *Witherspoon* decision "show clearly that identifiable segments of the community are excluded by the death qualification of the jury. . . ." He cited several such studies, but did not request an evidentiary hearing to establish their validity. The oral argument on his motion is not part of the record. The motion was denied and the prospective jurors were extensively questioned concerning their attitude toward capital punishment. Fifteen potential jurors were excused because of their scruples against the death penalty. Several of the excused jurors stated, however, that their opposition to capital punishment would not prevent them from reaching an impartial decision on the issue of guilt.[3] The exclusion of these 15 jurors from the phase of the trial at which defendant was found guilty of first degree murder forms the centerpiece of defendant's appeal.

---

[3]Defendant suggests that two prospective jurors were excused in violation of the *Witherspoon* criteria. He concedes, however, that that claimed error, as such, cannot affect the propriety of the verdict finding him guilty. The concession is proper. (*People* v. *Murphy* (1972) 8 Cal.3d 349, 368, fn. 17 [105 Cal.Rptr. 138, 503 P.2d 594]; *People* v. *Brawley* (1969) 1 Cal.3d 277, 289 [82 Cal.Rptr. 161, 461 P.2d 361].) In any event, defendant's whole point is that jurors *properly* excluded were the very ones who would have been most defense minded on the issue of guilt.

The starting point of defendant's argument here is footnote 18 of *Witherspoon* v. *Illinois, supra,* 391 U.S. 510.[4] He claims that he has, indeed, established that the jury which convicted him "was less than neutral with respect to guilt." He bases his argument on a series of studies which he analyzes in great detail.[5] Asserting that these "studies fill in the gap left open by the incomplete data available at the time of *Witherspoon*," he proceeds to argue that the death qualification of the jury during the guilt phase of his trial resulted in a denial of his constitutional rights. He also suggests that if his analysis of the post-*Witherspoon* studies does not convince us that a death-qualified jury is guilt-prone, we should remand the case "for an evidentiary hearing or factual referent in order to resolve the legal issues raised by appellant's attack on jury selection practices in capital cases."

In spite of the persuasiveness of defendant's scholarly presentation, it is our view that nearly all of his contentions have been answered by our Supreme Court. Most of defendant's arguments stand and fall on the proposition that a death-qualified jury is more conviction-prone than one from which hard core opponents of the death penalty have not been culled. As noted, he attempts to persuade us of that proposition by his analysis of the studies referred to in footnote 5 *ante*; and failing that, suggests that we remand the case for an evidentiary hearing or a

---

[4]"Even so, a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to *guilt.* If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view as to its proper resolution." (*Witherspoon* v. *Illinois, supra,* 391 U.S. p. 520, fn. 18 [20 L.Ed.2d p. 784].)

[5]Jurow, *New Data on the Effect of a "Death Qualified" jury on the Guilt Determination Process"* (1971) 84 Harv.L.Rev. 567; Bronson, *On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Venire-men* (1970) 42 Colo.L.Rev. 1; Roberts & Jessor, *Authoritarianism, Punitiveness and Perceived Social Status* (1958) 56 J. Abnormal & Soc. Psych. 311; Adorno, The Authoritarian Personality (1950); Boehm, *Mr. Prejudice, Miss Sympathy, and the Authoritarian Personality: An Application of Psychological Measuring Techniques to the Problem of Jury Bias,* 1968 Wis.L.Rev. 734; Zeisel, *Some Data on Juror Attitudes Toward Capital Punishment,* Centers for Studies in Crim. Justice (1968) U. of Chi. L. School, pp. 19-24; Crosson, *An Investigation Into Certain Personality Variables Among Capital Trial Jurors* (1966 Doctoral Dissertation, W. Res. U.); Rokeach & McClellan, *Dogmatism and the Death Penalty: A Reinterpretation of The Duquesne Poll Data (1969-1970)* 8 Duq. L.Rev. 125; White, *The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries* (1973) 58 Cornell L.Rev. 1176; Goldberg, *Toward Expansion of Witherspoon: Capital Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law* (1970) 5 Harv.Civ.Rights—Civ.Lib. L.Rev. 53.

reference. ▆ It is, however, quite clear, that our Supreme Court will not tolerate such retroactive invalidation of trial juries. What the authorities which culminated in *People* v. *Sirhan* (1972) 7 Cal.3d 710, 747-749 [102 Cal.Rptr. 385, 497 P.2d 1121] make unmistakably clear is that the Supreme Court has an open mind on the issue raised in footnote 18 of *Witherspoon,* but that it will not assume that a death-qualified jury is guilt-prone unless the defendant so proves at an evidentiary hearing in the trial court, which hearing must be requested and the request supported by an adequate offer of proof.[6] Assuming, for the sake of argument, that had defendant asked for an evidentiary hearing in the trial court the offer of proof would have been adequate,[7] the plain fact is that he never did ask for such a hearing. Until such a hearing establishes that a death-qualified jury is guilt-prone, the Supreme Court mandates that

---

[6]"The petitioners in *In re Anderson,* 69 Cal.2d 613, 621 [73 Cal.Rptr. 21, 447 P.2d 117], requested an evidentiary hearing regarding their claim that the exclusion of veniremen opposed to capital punishment results in an unrepresentative jury on the issue of guilt and substantially increases the risk of conviction, and we denied the request on the ground that they were then not ready for such a hearing and that the study they had underway did not warrant what would amount to an indeterminate stay of the judicial process. We subsequently denied other similar requests on the ground that the petitioner did not state whether or not he was prepared for an evidentiary hearing and gave no indication of the nature of the evidence he intended to introduce. (*People* v. *Robles,* 2 Cal.3d 205, 219 [85 Cal.Rptr. 166, 466 P.2d 710]; *People* v. *Brawley,* 1 Cal.3d 277, 298 [82 Cal.Rptr. 161, 461 P.2d 361] [cert. den. 400 U.S. 993 (27 L.Ed.2d 441, 91 S.Ct. 462)]; *In re Eli,* 71 Cal.2d 214, 218 [77 Cal.Rptr. 665, 454 P.2d 337] [cert. den. 396 U.S. 1020 (24 L.Ed.2d 512, 90 S.Ct. 589)]; *In re Arguello,* 71 Cal.2d 13, 17 [76 Cal.Rptr. 633, 452 P.2d 921].)

"The instant case differs from *Anderson, Robles, Brawley, Eli* and *Arguello* in that here defendant stated that he was prepared for an evidentiary hearing and specified the general nature of the evidence he intended to introduce. The case also differs from *Witherspoon* in that a request was made in the lower court to submit evidence on the matter. However, in our opinion the court did not err in denying the request, since defendant's offer of proof was insufficient to require such a hearing. Although a hearing might have eliminated uncertainties as to matters with respect to which the Supreme Court in *Witherspoon* stated it could only speculate such as the meaning of terms in the studies before the Supreme Court in that case, the offer of proof failed to show that the data upon which Zeisel based his opinion was significantly more substantial than that adduced by the petitioner in *Witherspoon.* To the contrary the data relied upon by Zeisel relating specifically to whether a juror's attitude toward the death penalty affects his determination regarding guilt was the same data that was analyzed in his preliminary manuscript, which was before the Supreme Court in *Witherspoon.*" (*People* v. *Sirhan* (1972) 7 Cal.3d 710, 748-749.)

Defendant suggests that *People* v. *Brawley* (1969) 1 Cal.3d 277, 298 [82 Cal.Rptr. 161, 461 P.2d 361] and *People* v. *Murphy* (1972) 8 Cal.3d 349, 368 [104 Cal.Rptr. 138, 503 P.2d 594] indicate the propriety of an appellate reference for an evidentiary hearing if the request therefor is accompanied by an adequate offer of proof. In those two cases the reference was denied because the offer was too little. It was therefore unnecessary to point out that it was also too late.

[7]The list of studies cited by defendant in the trial court was far less extensive than those cited to us.

we assume that it is not. That is the necessary import of the cases cited in the excerpt from *Sirhan* quoted in footnote 6, *ante*.[8]

Defendant insists that our Supreme Court's repeated insistence on an evidentiary hearing cannot survive the United States Supreme Court's recent decision in *Ballew* v. *Georgia* (1978) 435 U.S. 223 [55 L.Ed.2d 234, 98 S.Ct. 1029]. In *Ballew* the court invalidated a Georgia statute providing for five-person juries in misdemeanor cases. Unquestionably the opinion authored by Mr. Justice Blackmun and concurred in by Mr. Justice Stevens relied extensively on studies the validity of which was not established at an evidentiary hearing. Nevertheless, there are at least three reasons for holding that *Ballew* does not affect *Sirhan* and its predecessors: (1) In *Williams* v. *Florida* (1970) 399 U.S. 78, 86-103 [26 L.Ed.2d 446, 452-462, 90 S.Ct. 1893], the court had held that six-man juries did not violate the Constitution. It recognized, however, that it was on a "slippery slope" toward an unthinkable holding that juries of "four or two or even zero" might be valid. (*Id.,* p. 91, fn. 28 [26 L.Ed.2d, p. 455].) The *Ballew* reliance on unproved studies may mean no more than that, in view of that predicament, any foothold was welcome. (2) Only one other justice signed the opinion. None of the other seven who—with varying caveats—joined in the result, expressly subscribed to the method by which it was reached. Mr. Justice Powell, together with the Chief Justice and Mr. Justice Rehnquist expressed "reservations as to the wisdom—as well as the necessity—of Mr. Justice Blackmun's heavy reliance on numerology derived from statistical studies." (3) We seriously doubt whether United States Supreme Court methodology with respect to the factual underpinnings of one constitutional holding binds the state with respect to all others.

Defendant seeks to escape from the rule that—barring evidentiary proof to the contrary—it must be assumed that a death-qualified jury is not guilt-prone, by arguing that the exclusion of "death-scrupled" jurors deprives him of "fundamental due process rights and the right to an impartial trial by jury through the systematic exclusion of an identifiable segment of the community." (*Taylor* v. *Louisiana* (1975) 419 U.S. 522, 530 [42 L.Ed.2d 690, 698, 95 S.Ct. 692]; *Peters* v. *Kiff* (1972) 407 U.S. 493, 502-504 [33 L.Ed.2d 83, 93-95, 92 S.Ct. 2163].) Conceding, as he must, that the People have a legitimate interest in having a death-

[8]To which collection one might add *People* v. *Rhinehart* (1973) 9 Cal.3d 139, 155 [107 Cal.Rptr. 34, 507 P.2d 642] and *People* v. *Murphy* (1972) 8 Cal.3d 349, 367-368 [105 Cal.Rptr. 138, 503 P.2d 594]; cf., *People* v. *Thornton* (1974) 11 Cal.3d 738, 753-754 [114 Cal.Rptr. 467, 523 P.2d 267].

qualified jury decide the question of penalty (e.g., *People* v. *Nicolaus* (1967) 65 Cal.2d 866, 882 [56 Cal.Rptr. 635, 423 P.2d 787]) he nevertheless argues that this interest relates only to the penalty phase and that there is "no rational relation between the classification and a legitimate State goal, and the exclusion of death-scrupled jurors at the guilt phase is a violation of equal protection even under the liberal rational relation test."

The argument that the state's right to a death-qualified jury applies only to the penalty phase was repeatedly rejected under the death penalty statute held unconstitutional in *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880]. In *People* v. *Washington* (1969) 71 Cal.2d 1061, 1087-1089 [80 Cal.Rptr. 567, 458 P.2d 479], the issue was recanvassed by the Supreme Court in the light of *Witherspoon.* Adhering to its previous decisions the court again stressed the legislative preference that the same jury try all phases of a capital case: "We have recently held that the mandate of Penal Code section 190.1 requiring the same jury to be used in both the guilt and penalty phases of the trial whenever possible, 'neither denies the defendant due process of law nor favors the prosecution over the defense.' (*People* v. *Gonzales* (1967) 66 Cal.2d 482, 498 [58 Cal.Rptr. 361, 426 P.2d 929].) The defendant in that case argued, as does defendant herein, that separate juries should be chosen for the guilt and penalty phases and that jurors indicating that they can fairly and impartially decide the question of guilt should not be excused because of their inability to impose the death penalty. *We held that the ' "legislative preference for the same jury at both trials deprives the defendant neither of due process nor of the right to an impartial jury. Since all of the evidence properly introduced at the trial on the issue of guilt is relevant in determining the penalty (Pen. Code, § 109.1), having the same jury avoids repetition of evidence and is thus not an arbitrary requirement." '* (*People* v. *Gonzales, supra,* 66 Cal.2d at p. 499.) Defendant has presented no factual evidence which would persuade us to reach a result different from that stated in *Gonzales.* That case fully disposes of his argument that separate juries are required." (*Id.,* p. 1089, italics added.)

The legislative preference for having the same jury try the issue of guilt and penalty did not change when the Legislature enacted the death penalty statute under which defendant was tried. (Stats. 1973, ch. 719, § 4, p. 1298.) Section 190.1 of the Penal Code still said that "[i]f the defendant was convicted by a jury, the trier of fact shall be the same jury . . . ."

Thus there can be no question that the state's interest in having the same jury decide guilt and penalty has been held to provide a sufficient

rational basis for excluding death-scrupled jurors at the guilt phase.[9] The only real question is whether this rational basis can survive an intervening holding that the very death penalty statute under which the trial was conducted was unconstitutional.

That question may have been answered in *People* v. *Thornton* (1974) 11 Cal.3d 738, 753-754 [114 Cal.Rptr. 467, 523 P.2d 267], where the *Washington* rule was reaffirmed although, because of the intervening *Anderson* decision, the death penalty imposed by the *Thornton* jury had to be set aside. *Thornton,* therefore, appears to be a persuasive holding that the invalidation of a death penalty statute does not mandate reversal on the issue of guilt even though the jury, which determined that issue, was selected under criteria justifiable only on the assumption that a valid death penalty can be imposed. We see only two possible distinctions of *Thornton*: the first relates to the nature of the death penalty statute under which defendant was tried, the second to the constitutional angle from which his counsel approaches the issue.

There are, of course, differences between the death penalty statute in effect when *Thornton* was tried and the 1973 statute involved in this case. They stem from the fact that under the 1973 statute the death penalty was mandatory if the jury found certain special circumstances to be true. From this it followed that: (1) it was theoretically possible to try a death penalty case to a jury which did not even know that the defendant's life hung in the balance; (2) even if the jury did know, it was possible to conduct both phases of the trial without the subject of capital punishment being mentioned; and (3) no juror would be called upon to assent to a verdict which expressly imposed the death penalty.

The fact that it was theoretically possible to try the case to 12 jurors who were unaware that they were sitting in a capital case must remain just that: a theoretical possibility. Obviously there was no way for the court to find out without letting the cat out of the bag. We take judicial notice that the passage of the 1973 legislation which followed the adoption of article I, section 27 of our state Constitution on November 7, 1972 and the decision in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726] earlier that year, was attended by much publicity in all media. The trial court would have played Russian roulette with the People's apparent right to a death-qualified jury had it blithely assumed that the prospective jurors thought that this was just another

---

[9]We reemphasize that the rule reiterated in *Washington* rests on the assumption that a death-qualified jury is not guilt-prone. Defendant has not established that the assumption is false.

criminal trial which, for unfathomable reasons, was being conducted in two installments.

Once the trial court had to assume that at least some of the prospective jurors knew that they were being selected to try a capital case, the People became entitled to their statutorily approved challenge for cause. (Pen. Code, § 1074, subd. 8.) Of necessity this involved questioning the jurors about their attitudes toward the death penalty. The fact that the balance of the trial could be conducted without capital punishment being mentioned seems quite immaterial.

Nor do we think that the third distinction—that no juror would be called upon to agree to a verdict which expressly imposed the death penalty—is of any significance. It assumes that a juror who would not even consider returning a verdict of death, and would automatically vote against the imposition of capital punishment, would nevertheless find special circumstances to be true and, like Pontius Pilate, wash his conscience of the consequences.

The second possible distinction from *Thornton* is, as we said, defendant's constitutional approach—if, indeed, there is a difference. The *Thornton* opinion does not make it clear whether the argument refuted there was based only on the unsound premise that the death-qualification of the guilt jury deprived the defendant of defense-minded jurors, or whether it included the point that the exclusion of hard-core opponents of capital punishment resulted in "the systematic exclusion of an identifiable segment of the community," impermissible regardless of a showing that the excluded prospective jurors would have been less guilt-prone than those who were seated.[10] (*Taylor* v. *Louisiana* (1975) 419 U.S. 522, 530 [42 L.Ed.2d 690, 698, 95 S.Ct. 692].) The latter, in any event, is defendant's approach. He argues, in effect, that given an invalid death penalty statute, excusing death-scrupled jurors at the guilt phase was no more justifiable than, say, the arbitrary exclusion of all prospective jurors born in June or July.

---

[10]"Defendant contends that he was denied due process in the guilt phase because certain prospective jurors who expressed an inability to impose the death penalty, and were excused for cause, nevertheless either (1) stated that their views *would not* prevent them from rendering a fair and impartial decision on the issue of guilt, or (2) stated that their views *might* prevent them from rendering a fair and impartial decision on the issue of guilt, or (3) were not asked whether their views would have such an effect. These prospective jurors, it is urged, should have been allowed to sit on the jury for the trial of issues of guilt." (*People* v. *Thornton, supra,* 11 Cal.3d at p. 753.)

■    Speaking generally, there is no question that if the state systematically excludes "large, distinctive groups," the jury does not represent a fair cross-section of the community and that a defendant who challenges such a practice need not show that he is a member of the excluded group[11] or that he has been prejudiced by the practice. (*Taylor* v. *Louisiana, supra.*)[12]

We pass the question whether prospective jurors conscientiously opposed to the death penalty form a sufficiently distinctive group—a "cognizable class"—and assume that they do. (Cf., *Adams* v. *Superior Court* (1974) 12 Cal.3d 55 [115 Cal.Rptr. 247, 524 P.2d 375].)
■    Nevertheless, in spite of the general rule, under the peculiar circumstances under which the jury which convicted defendant was chosen, the exclusion of the death-scrupled prospective jurors should not lead to reversal. The trial took place in mid-1975 after *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726] and before *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909] and its companion decisions. Although *Gregg* proved that our Legislature misinterpreted *Furman,* the trial court had every reason to assume otherwise. (*Rockwell* v. *Superior Court, supra,* 18 Cal.3d 446-448 (Clark, J. conc.).) Thus the exclusion of a portion of the prospective jurors was not the result of an arbitrary rule excluding a distinctive segment of the population, but a rational—albeit mistaken—collateral consequence of a penalty statute thought to be valid. A reversal would be a sacrifice of substance to a compulsive passion for symmetry.

The judgment is modified to provide a punishment of life imprisonment instead of death and, as so modified, is affirmed.[13]

Stephens, J., and Ashby, J., concurred.

A petition for a rehearing was denied May 25, 1978, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied June 28, 1978.

---

[11]Defendant, who was found to have committed an execution-style killing, might have had a problem on that score.

[12]*People* v. *Superior Court (Dean)* (1974) 38 Cal.App.3d 966, 972-975 [113 Cal.Rptr. 732] may need reconsideration in the light of *Taylor* v. *Louisiana.*

[13]The People's submission that the case should be remanded for a new death penalty trial has no merit. (*People* v. *Harvey* (1977) 76 Cal.App.3d 441 [142 Cal.Rptr. 887]; *People* v. *Payne* (1977) 75 Cal.App.3d 601 [142 Cal.Rptr. 320].)