[Crim. No. 1202. Fifth Dist. July 26, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL LEE WHALEN, Defendant and Appellant.

## COUNSEL

Thomas Shanle, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Eddie T. Keller and G. Michael Gates, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GARGANO, J.**—By information filed in the Superior Court of Tulare County, defendant, Daniel Lee Whalen, was charged with one count of murder in violation of Penal Code section 187, three counts of first degree robbery in violation of Penal Code section 211, and one count of assault

with a deadly weapon on a police officer in violation of Penal Code section 245. Defendant entered pleas of not guilty to all charges and then moved for a change of venue; his motion was denied. After jury trial defendant was convicted of one count of robbery and one count of assault with a deadly weapon on a police officer; he was sentenced to state prison on each count, the terms to run concurrently. Defendant has appealed.

We recite the facts in the light most favorable to respondent.

On December 19, 1970, defendant and Steven Louis Strang went to the residence of Terry Gott in Artesia, California, to drive Gott and his family to the home of Gott's parents in Tulare. Strang was carrying a gun in his belt, and when Gott objected he put the gun in the trunk of his automobile. Then Strang, defendant and the Gotts headed toward Tulare in Strang's blue Falcon. At about 5 o'clock in the afternoon the group stopped at a bowling alley in Newhall, California. Strang gave Gott $5 for food and told him to wait at the bowling alley as he was going to get some money from a friend to buy snow chains. He opened the trunk of the car, put the gun in his waistband and drove from the parking lot with defendant asleep in the front seat on the passenger side. An hour later the two men returned; they had robbed a liquor store. Strang went into the bowling alley and told the Gotts that he had the money for the snow chains. The party then continued on the trip to Tulare, arriving at the home of Gott's parents at about 3 o'clock the following morning; defendant was in "poor condition" and had to be carried into the house; he had drunk three beers on the trip and had taken five or six "reds."

On December 20, 1970, at about 9 o'clock in the morning, Strang and defendant drove in Strang's blue Falcon to Monty's Walkup drive-in restaurant on Highway 68. Strang got out of the car, walked up to the building, stuck a gun through a window and told the waitress to give him money; she gave him $40. The manager came into view, and Strang said, "Hey you, in there, hey, you step back here or I'll kill this woman." He pulled the trigger but the gun misfired. Strang ran to his automobile and entered on the passenger side; the car was driven away rapidly. A few minutes later Strang entered Richard's Bottle Shop. He approached the proprietor and two customers and said, "This is a stickup, get your hands up." Strang told the proprietor not to move and then shot and killed him. Strang attempted to open the cash register but was unsuccessful. He returned to his automobile; Strang testified that he drove it to Hamilton's Drug Store. Strang entered the drug store, pointing the gun at Frances Brathrick, demanding money. Mrs. Brathrick dropped the money and Strang shot at her; the

bullet struck her on the foot. A customer entered the store and Strang ordered him to lie on the floor; Strang took the customer's money and left.

Officer Kimberly Dawson of the Tulare Police Department spotted the blue Falcon as it was leaving the scene of the Hamilton Drug Store robbery; he pursued the fleeing vehicle. A short time later Dawson succeeded in moving his police car along side of the Falcon. However, when appellant, who was seated in the front seat on the passenger side, pointed a gun at Dawson, the officer slammed on his brakes and fell back. Then Officer William Kimball rammed his police car into Strang's automobile, pushing it into the curb; Kimball had heard Dawson's radio call for assistance and had joined the pursuit near the intersection of Larkin and Inyo Streets. After an exchange of shots, Strang exited from the driver's side and defendant from the passenger side. Strang headed toward Dawson, swearing, and Dawson hit him three times with the back of a shotgun. Dawson turned and saw defendant advancing on Officer Kimball; from behind, Dawson struck defendant in the right leg. Defendant turned and started to swing on Dawson but was struck in the face with the back of the shotgun. Defendant was forced down and handcuffed, yelling that he was going to get Dawson.

Defendant's sole defense was that he was in a state of unconsciousness at the time of the robberies and did not know that the crimes were being committed. He testified that he regularly took drugs, that during the week of the crimes he had been taking about 30 "reds" and "whites" a day and that on December 19, he was "loaded." Defendant did not remember stopping at Newhall or arriving in Tulare or driving with Strang to Monty's Walkup restaurant or to Richard's Bottle Shop or to Hamilton's Drug Store. He said he heard the police sirens but denied pointing the gun at Officer Dawson.

The record presents a sordid picture of drug abuse. Nevertheless, there was ample evidence to support the jury's verdict. The manager of Monty's Walkup testified that defendant was seated behind the wheel of the blue Falcon when Strang entered from the passenger side and that he was the man who drove the automobile rapidly away. A prosecution witness said that he saw the blue Falcon in the parking lot of Hamilton's Drug Store about two minutes before Strang came out and that there was one man in the vehicle who parked it headed east. Officer Dawson testified that after Strang's automobile was pushed to the curb, defendant came out fighting, and when he was subdued he said he would get Dawson; later, he told the officer, "I'm sorry we shot and caused so much trouble, but it's over with." Dr. Charles A. Davis stated that he interviewed defendant on the evening

of his arrest and that defendant admitted participating in the robberies; the doctor said that defendant told him he heard sirens and knew that he was being pursued by police cars.

■ We consider defendant's contention that the court erred in denying his motion for a change of venue and that the error requires reversal. He makes these assertions: that a capital offense was charged and that the murder was senseless; that defendant was a stranger in the community and the murder victim a prominent citizen; that the County of Tulare is a small community and the newspaper, radio and T.V. coverage was sensational.

■ A change of venue must be granted when the defendant shows "'a reasonable likelihood that in the absence of such relief, a fair trial cannot be had.'" (*Frazier* v. *Superior Court,* 5 Cal.3d 287, 294 [95 Cal. Rptr. 798, 486 P.2d 694]; *Maine* v. *Superior Court,* 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372].) If the issue is raised on a petition for writ of mandate, or after trial on appeal from a judgment of conviction, the reviewing court must make an independent evaluation of the circumstances and must satisfy itself de novo that defendant obtains a fair and impartial trial. (*People* v. *Welch,* 8 Cal.3d 106 [104 Cal.Rptr. 217, 501 P.2d 225]; *People* v. *Tidwell,* 3 Cal.3d 62 [89 Cal.Rptr. 44, 473 P.2d 748]; *Maine* v. *Superior Court, supra,* 68 Cal.2d 375.) But, if the venue issue is raised after trial the defendant "'cannot complain if inferences of possible prejudice, available on a semi-silent record, have been refuted by the actualities of *voir dire* and of trial.'" (*People* v. *Blake,* 21 Cal.App.3d 211, 220 [98 Cal.Rptr. 409]; *People* v. *Quinlan,* 8 Cal.App.3d 1063, 1070 [88 Cal. Rptr. 125]; *People* v. *Frogge,* 270 Cal.App.2d 106 [75 Cal.Rptr. 517].)

■ The defendant has failed to establish a reasonable likelihood that he could not have a fair trial in Tulare County. First, Tulare County is not a small community nor was the newspaper, radio and T.V. coverage sensational; the county has a population of about 200,000, and the news items were factual. Second, a capital offense was charged and the murder was senseless, but the jurors acquitted defendant of that charge, demonstrating that they were not prejudiced by the gravity of the offense. Also, the murder victim was not a prominent citizen; of over 100 prospective veniremen questioned, less than four knew him. Third, although defendant was a stranger to the area, the record is devoid of any evidence of public hostility. Of the 12 jurors who were impaneled, one vaguely remembered reading about the crime but recalled no details, another read about the case and recalled nothing about it, and the other 10 were extensively questioned by the court and counsel and passed for cause.

■ We turn to defendant's first specification of error. He insists that the court should have given, *sua sponte,* an instruction on voluntary intoxication in relation to the assault with a deadly weapon on a police officer.

Defendant admits that an assault with a deadly weapon on a police officer is a general intent crime and that voluntary intoxication is not, ordinarily, a defense to such a crime. (*People* v. *Hood,* 1 Cal.3d 444 [82 Cal.Rptr. 618, 462 P.2d 370]; *People* v. *Rocha,* 3 Cal.3d 893 [92 Cal.Rptr. 172, 479 P.2d 372]; *People* v. *Parks,* 4 Cal.3d 955 [95 Cal.Rptr. 193, 485 P.2d 257].) He argues that to commit the aggravated assault proscribed by section 245, subdivision (b), a person must know that he is assaulting a police officer, and that it is to negate such knowledge that an instruction on voluntary intoxication must be given. Defendant relies on the proposition that "where knowledge is a requisite element of a crime, the court must instruct, on its own motion, that in determining the existence of such knowledge the jury may take into consideration the fact that the accused was intoxicated at the time he committed the act in question if there is evidentiary basis for such instruction." (*People* v. *Foster,* 19 Cal.App.3d 649, 655-656 [97 Cal.Rptr. 94].)

In view of the evidence presented in this case, appellant's contention that the court erred in failing to instruct on voluntary intoxication must be predicated on the assumption that nothing less than actual knowledge will suffice for the commission of an assault with a deadly weapon on a peace officer. This assumption, however, runs counter to the explicit language of Penal Code section 245, subdivision (b); the section states that the crime is committed if the person "knows or reasonably should know" that his victim is a peace officer. Defendant's categorical assumption also thwarts the legislative purpose; the law was obviously adopted to discourage wanton attacks upon peace officers who are often called upon to risk their lives for the protection of society. To paraphrase the words of Mr. Justice Traynor in *People* v. *Hood, supra,* 1 Cal.3d 444, 458, it would be anomalous to allow evidence of intoxication, whether from the consumption of alcohol or drugs, to relieve a man of responsibility for viciously attacking a police officer with a deadly weapon when he reasonably should have known that the victim was a police officer; such crimes are frequently committed in just such a manner.

Officer Dawson testified that his red light and siren were on when he pulled his police car along side of the Falcon, and the defendant admitted that he heard the siren. In addition, he admitted that he knew that Strang had pulled in front of a police car. Defendant knew or reasonably should

have known, therefore, that he was pointing a gun at a police officer, and his intoxication was no defense to the crime he committed.[1]

■ We also summarily reject defendant's secondary argument that the court should have instructed, on its own motion, on the lesser included offense of assault with a deadly weapon. No evidence was presented by either defendant or the People which would have exculpated defendant of the greater offense while at the same time laying a foundation for a verdict on the lesser one. If the People's evidence is believed, defendant pointed a gun at Officer Dawson with actual knowledge that Dawson was a police officer, and the lesser offense was committed only because the greater offense could not be committed without also committing the lesser one. On the other hand, if defendant's evidence is believed, he was guilty of neither the greater nor the lesser offense; he testified that he did not remember taking part in the robberies, that he did not realize that anything was wrong until he heard the police sirens and that he did not point a gun at Officer Dawson. Under these circumstances, an instruction on the lesser offense was not mandatory. (*People* v. *Morrison*, 228 Cal.App.2d 707, 713 [39 Cal.Rptr. 874]; *People* v. *Perkins*, 9 Cal.App.3d 1048 [88 Cal.Rptr. 720].)

■ Defendant's third specification of error is that his statements to Dr. Davis should have been suppressed by the court because the psychiatrist did not advise defendant that he had the right to have an attorney present during the interview and that if he could not afford a lawyer one would be appointed for him. He told defendant he had the right to remain silent, that any information he gave during the interview could be used in court, and that he had "the right to have an attorney represent him."

After defendant was arrested and brought to the police station, he was advised of all his constitutional rights by Officer Dawson; when asked if

---

[1]On redirect examination defendant testified as follows:

"Q. When did you first realize that the police were after you?

A. When Steve pulled in front of the police car and the sirens were going, I noticed it.

Q. Had you pointed a gun at the police?

A. No.

Q. Would you describe what you remember of the events after this police car— after you turned in front of this police car, Steve did?

A. I remember the car being stopped, I started stepping out, falling back in it, and I remember being outside the car and getting hit in the mouth with a shotgun butt.

Q. Do you remember screaming and cursing at the police?

A. No."

he understood the rights, defendant said, "I understand, screw." A few minutes later defendant told Dawson, "I'm sorry we shot and caused so much trouble, but it's over with." On the same evening Dr. Davis not only explained to defendant that the information he gave to the doctor would not be confidential, but he also told defendant that he could remain silent; although defendant was surprised to learn that the interview would not be confidential, he said he would talk anyway. There was ample basis for the trial judge to find that defendant was still aware of his constitutional rights when he was interviewed by Dr. Davis and that he knowingly and intelligently waived those rights before talking to the doctor. (*People* v. *Cooper,* 10 Cal.App.3d 96, 107 [88 Cal.Rptr. 919].)

As requested by appellant and as conceded by the People, the judgment must be modified as to the armed clause. (*People* v. *Hicks,* 4 Cal.3d 757, 765-766 [94 Cal.Rptr. 393, 484 P.2d 65]; *People* v. *Floyd,* 71 Cal.2d 879, 893 [80 Cal.Rptr. 22, 457 P.2d 862]; *People* v. *Harrison,* 5 Cal.App. 3d 602, 608-609 [85 Cal.Rptr. 302].) The judgment as to count II is modified by striking all of the "armed clause language." In count V the judgment is modified to state that defendant was armed with a deadly weapon at the time of the commission of the offense within the meaning of Penal Code section 1203, but Penal Code sections 3024 and 12022 are not applicable.

The judgment is affirmed as modified.

Brown (G. A.), P. J., and Franson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 19, 1973.