82 Cal.App.3d 1 (1978)
147 Cal. Rptr. 208
THE PEOPLE, Plaintiff and Respondent,
v.
DAVID RUDY MARTINEZ, Defendant and Appellant.
Docket No. 3093.
Court of Appeals of California, Fifth District.
June 22, 1978.
*6 COUNSEL
Carl B. Shapiro, under appointment by the Supreme Court, for Defendant and Appellant.
Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Joel Carey, Robert D. Marshall and Paul V. Bishop, Deputy Attorneys General, for Plaintiff and Respondent.
OPINION
FRANSON, Acting P.J. 

STATEMENT OF THE CASE
On May 2, 1975, an amended information was filed in the superior court charging appellant with the following crimes: count I, violation of Penal Code section 209, kidnaping for the purpose of robbery where the victim suffered bodily harm, to wit, death; count II, violation of Penal Code section 261, subdivision 2, forcible rape; count III, violation of *7 Penal Code section 211, robbery; count IV, violation of Penal Code section 187, murder. It was also alleged that during the commission of counts I through IV, appellant used a firearm in violation of Penal Code section 12022.5. It was further alleged, under former Penal Code section 190.2, subdivision (b)(3), that the murder was willful, deliberate, and premeditated and was committed during the commission of kidnaping, rape, and robbery. As an additional special circumstance, it was also alleged, under former Penal Code section 190.2, subdivision (b)(4), that appellant had suffered a prior conviction for murder.[1]
On June 13, 1975, appellant filed a motion for a change of venue pursuant to Penal Code section 1033, subdivision (a); the motion was denied. On July 2, 1975, a petition for writ of mandate was filed in this court seeking to compel the superior court to grant a change of venue; that petition was summarily denied by minute order without opinion (Martinez v. Superior Court (July 14, 1975) 5 Civ. 2664).
On September 8, 1975, the matter came on for jury trial. On October 10, 1975, the jury returned a verdict finding appellant guilty of all counts charged in the information. The jury further found that the murder (count IV) was of the first degree and that appellant had used a firearm during the commission of counts I, III, and IV, but not during the commission of count II.
On October 14, 1975, a hearing was held on the alleged special circumstances. Appellant waived a jury trial on that issue; it was stipulated and the court found, that appellant had suffered a prior conviction for murder in the second degree (former Pen. Code, § 190.2, subd. (b)(4)). The court also found that the instant murder was committed during the commission of robbery, kidnaping, and rape (former Pen. Code, § 190.2, subd. (b)(3)). Thereafter, the court ordered that appellant be sentenced to death. Sentence on counts I, II, and III were suspended.
On October 14, appellant moved for a new trial on the grounds, among others, (1) the trial judge was prejudiced against him because during the trial he expressed the opinion that appellant was guilty and (2) the jury was guilty of prejudicial misconduct in taking maps into the jury room which had not been received in evidence. The motion for a new trial was denied.

*8 STATEMENT OF THE FACTS
Although appellant does not challenge the substantiality of the evidence to support his convictions, in light of the contentions that prejudicial error was committed during the trial it is necessary to recite the facts in some detail.
In midsummer of 1974, appellant, his brother Tommy Martinez, his sister-in-law Catalina Martinez, Abel Ramirez, Ramirez' girl friend, and several of the Ramirez children, were vacationing together. The group toured Yosemite and Sequoia National Parks, finally arriving in the vicinity of Lake Isabella in the Kern River Canyon area on August 5, 1974. The Ramirez and Martinez families made camp that first night at approximately 6 p.m. near Hobo Hot Springs in the Kern River Canyon.
The next day, August 6, 1974, appellant and Abel Ramirez argued about appellant's having furnished beer to one of Ramirez' minor children. The upshot of the argument was that appellant, who had been drinking and smoking marijuana, threatened to leave the camp. Appellant did leave in the evening. Appellant took with him a knapsack and Tommy Martinez' .25 caliber Titan pistol.
At approximately 10 p.m. on August 6, Don Weghorst, while driving eastbound, picked up a male hitchhiker on Kern Canyon Road in the Kern River Canyon about 10 to 12 miles west of Hobo Hot Springs. Weghorst continued eastbound past Hobo Hot Springs, took the hitchhiker to the Town of Isabella, and dropped him off shortly after 11 p.m. about two blocks from the Kern River Valley Review Newspaper. The hitchhiker was described by Weghorst as "oriental" and carrying a small satchel.
On the night of August 6, the victim, Joan Peart, was at the office of the Kern River Valley Review Newspaper in the Town of Isabella. It was press night and the entire staff was working late in an attempt to publish the weekly paper. At approximately 11:30 p.m., Ms. Peart left the newspaper to go home to run an errand. She borrowed the car of Mr. Quinn, the owner and publisher of the newspaper. Quinn's car was a 1970 Oldsmobile (license CQU 135). Ms. Peart left the newspaper office with the keys to the car.
In the very early hours of the morning of August 7, Nancy Hall and her mother and stepfather, Ruth and William Cusson, were driving from *9 Bakersfield to Lake Isabella via the Kern River Canyon Road. At approximately 12:30 a.m., shortly after they had entered the canyon near a place called Rocky Point, Hall and the Cussons noticed a young woman staggering up the bank from the river. When the woman waved for William Cusson to stop, he pulled over to offer assistance.
The young woman identified herself as Joan Peart and said, "I've been beaten, I've been raped and he stole my car." She kept repeating her story about being beaten and raped; she described her assailant as being "oriental." Ms. Peart was bleeding from her head, mouth and legs and appeared to be in shock. She also continued to mumble that her assailant had stolen the car.
The Cussons placed Ms. Peart in the rear of their car and attempted to stop the bleeding while transporting her to a hospital. After the family came through the Kern River Canyon, they came upon a fire station where there was an ambulance. They awakened the firemen, and Ms. Peart was transferred to the ambulance and then taken to the Kern Valley Hospital.
Once at the hospital, Ms. Peart was examined by Dr. Jamie Lee Ho who discovered that she had been shot through the left thigh with the bullet ultimately lodging in the right thigh. It was also determined that she had been shot in the neck at approximately the level of the second vertebra. Due to the seriousness of Ms. Peart's condition, she was transferred to Mercy Hospital in Bakersfield. After arriving in Bakersfield, Ms. Peart was placed in the intensive care unit but her condition continued to deteriorate until she died early in the afternoon of August 7, 1974.
On the evening of August 7, appellant was confronted by security guard Artis Battle at the East Ridge Shopping Center in San Jose. Appellant was suspected of attempting to pass phony or stolen credit cards and was detained by Battle in the parking lot. Upon demand appellant surrendered the suspect cards but pulled a gun and then ran off. The pistol brandished by appellant was described as similar to Tommy Martinez' .25 caliber Titan.
On August 8, Kern County Deputy Coroner and Pathologist Dominick Ambrosecchia performed an autopsy on Joan Peart. Two bullets were retrieved from Ms. Peart's body and were identified as .25 caliber *10 copper-jacketed lead projectiles. In the pathologist's opinion, Ms. Peart's death was caused from multiple gunshot wounds involving the two projectiles removed from her body.
Also, on August 8, at approximately 6 a.m., Officer Douglas M. Canning of the Santa Clara County Sheriff's Department discovered Mr. Quinn's 1970 Oldsmobile in a parking lot at 24th and Williams Streets in San Jose. In the back seat of Mr. Quinn's car, among other things, were found hair samples that were similar in color, size, curl, texture, scale pattern, shape and pigmentation as those taken from the head of appellant.
Three or four days later, on approximately August 11th or 12th, Tommy Martinez returned to his home in San Jose where he found his brother, appellant. Tommy asked appellant what had become of his pistol; appellant revealed that he had taken it for protection when he left the camp. Tommy Martinez then retrieved the gun from appellant and placed it on an upper shelf in his closet. Tommy Martinez also testified that he noticed a plaque in his home that arrived at approximately the same time his brother did. He also testified that when his brother arrived at his home he brought a suitcase with him.
On October 15, 1974, apparently in connection with the investigation of another crime committed by appellant, Officer John Davis Bartholomew of the San Jose City Police Department went to the Tommy Martinez home. Officer Bartholomew conducted a consensual search of the home. As a result of that search, the officer discovered a suitcase, a plaque, and Tommy Martinez' .25 caliber Titan brand pistol with a box of shells. The suitcase and the plaque found in Tommy Martinez' home were subsequently identified by Mr. Quinn as having been in his automobile the night that it was stolen.
The .25 caliber Titan pistol found in the Tommy Martinez home was test fired and a ballistics expert testified that it was the gun which fired the fatal bullets into the body of Joan Peart.
On January 28, 1975, Officer Neil Gereke of the Kern County Sheriff's Department tape recorded a conversation Tommy and Catalina Martinez had with appellant during a visit at the Kern County jail. Following is that portion of the conversation which was admitted into evidence at trial.
*11 "[Appellant]: I don't know how they got everybody's names.
"Tommy: Well, Abel's truck, and credit cards, though, they came back uh, a sergeant up in San Jose was working on that credit card thing cause that's where you dumped them. And, uh, you know, you got me from when you bought us some gas in Three Rivers, and Abel from when we got gas in Exeter, I think it was.
"[Appellant]: He never got no gas.
"Tommy: Yes he did.
"[Appellant]: Did he?
".... .... .... .... ...
"[Tommy]: Huh, uh. Yeah. I got your stuff, uh. Well, as a matter of fact, they got most of your stuff now, cause like they went down to the house and picked up that.... Well, when you got picked up in L.A., I went down and uh, put all your stuff in that big suitcase, and that was a giveaway right.
"[Appellant]: Huh uh.
".... .... .... .... ...
"[Tommy]: [A]nd uh, I just wish I would have know about all that stuff, like that little plaque you left in our front room. They picked that up, too. That's why, you know, it's your best out.
"[Appellant]: Yeah.
".... .... .... .... ...
"[Catalina]: You should have said something about a lot of things that were at the house, cause uh, that's why you're going to have to play it like, you know, you weren't there, you weren't all there.
"[Appellant]: I told Tom to tell you and he said he did.
"[Catalina]: Tell me what?
"[Appellant]: To get rid of some of that stuff.
".... .... .... .... ...
"[Appellant]: It depends what I get convicted of here.
"Tommy: Yeah. Really. I'm hoping you pull a second out of it, you know.
"[Appellant]: I don't know. It's pretty slim."

*12 DEFENSE
After a court ruling that none of the appellant's felony convictions (including the second degree murder) could be used for the purpose of impeachment, appellant took the stand in his own behalf and testified as follows: On the night of August 6, 1974, he had had a misunderstanding with some members of his camping party and had gone to another camp nearby where he continued to drink beer and wine and smoke marijuana and hashish. He stayed there for about five hours. One of the men at the camp wanted to know where he could get some crystal (drugs) and appellant told him he knew some people in San Jose. Appellant gave the man, who he could not identify, a phone number in San Jose and the man left the camp on foot alone about 8 to 9 p.m. Later, the man returned to the camp with a car (subsequently identified as the Quinn car). Appellant and the man proceeded to San Jose where they arrived about 7 to 8 a.m. Appellant was able to obtain narcotics for the man in San Jose and they then parted company.

ISSUES
Appellant makes the following contentions:
(1) The trial court erred in denying the motion for change of venue.
(2) Government Code section 76014 deprived appellant of due process of law.
(3) The admission into evidence of the tapes recorded at the jail violated appellant's constitutional right to privacy.
(4) The trial judge committed prejudicial misconduct by commenting upon appellant's guilt.
(5) The prosecutor committed prejudicial misconduct in his argument to the jury.
(6) The trial court prejudicially erred in instructing the jury.
(7) The jury was guilty of prejudicial misconduct.
For the reasons to be explained, we conclude that none of the contentions have merit.

*13 THE MOTION FOR A CHANGE OF VENUE WAS PROPERLY DENIED
(1) When pretrial publicity creates a reasonable likelihood that a fair trial cannot be had, the trial court should continue the case until the threat abates or transfer it to another county. (Maine v. Superior Court (1968) 68 Cal.2d 375, 383 [66 Cal. Rptr. 724, 438 P.2d 372]; see Pen. Code, § 1033, subd. (a); Frazier v. Superior Court (1971) 5 Cal.3d 287, 294 [95 Cal. Rptr. 798, 486 P.2d 694].) (2) Whether raised on a petition for writ of mandate or on appeal from a judgment of conviction, the reviewing court must make an independent evaluation of the circumstances and must satisfy itself de novo that defendant obtained a fair and impartial trial. (People v. Welch (1972) 8 Cal.3d 106, 113 [104 Cal. Rptr. 217, 501 P.2d 225]; People v. Tidwell (1970) 3 Cal.3d 62, 68-69 [89 Cal. Rptr. 44, 473 P.2d 748].)
The factors to be considered are: (1) the nature and gravity of the offense; (2) the size of the community; (3) the status of the defendant in the community; (4) the popularity and prominance of the victim; and (5) the nature and extent of the news coverage. (People v. Salas (1972) 7 Cal.3d 812, 818 [103 Cal. Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832]; In re Miller (1973) 33 Cal. App.3d 1005, 1011 [109 Cal. Rptr. 648].)
A significant difference between pretrial and posttrial review is that after conviction in determining whether a defendant received a fair and impartial trial under the "reasonable likelihood" standard, the review is retrospective. It extends to an examination of what actually occurred at the trial. (People v. Witt (1975) 53 Cal. App.3d 154, 171 [125 Cal. Rptr. 653]; People v. Whalen (1973) 33 Cal. App.3d 710, 716 [109 Cal. Rptr. 282]; People v. Quinlan (1970) 8 Cal. App.3d 1063, 1070 [88 Cal. Rptr. 125].)
(3) Appellant has failed to demonstrate a "reasonable likelihood" that he would not receive a fair trial in Kern County. While the kidnaping, rape, and murder of a young woman is an extreme crime, it lacks the bizarre sensationalism associated with multiple victims such as appeared in Corona v. Superior Court (1972) 24 Cal. App.3d 872 [101 Cal. Rptr. 411], Frazier v. Superior Court, supra, 5 Cal.3d 287, Maine v. Superior Court, supra, 68 Cal.2d 375, Fain v. Superior Court (1970) 2 Cal.3d 46 [84 Cal. Rptr. 135, 465 P.2d 23], and People v. Tidwell, supra, 3 Cal.3d 62.
*14 Although appellant was a stranger to the community, Ms. Peart was not a well known citizen as were the victims in Frazier v. Superior Court, supra, 5 Cal.3d 287, Maine v. Superior Court, supra, 68 Cal.2d 375, and In re Miller, supra, 33 Cal. App.3d 1005. Her prominence existed for the most part in the Isabella area where she lived as opposed to Kern County as a whole. She had lived in the area only a short time and was not known throughout the county.
Kern County is not a small community; at the time of the trial it had a population of over 337,000 people and was the 14th largest county out of 58 in the state. (See People v. Whalen, supra, 33 Cal. App.3d 710, 716.)
Although the news coverage was widespread, the accounts were for the most part factual in nature and not sensational or inflammatory. Moreover, over half of the newspaper articles were published by the rural Kern River Valley Review with a circulation of approximately 4,000 weekly; the paper went out of business shortly after the crime occurred. The Bakersfield Californian which also carried the story had a circulation at time of trial of approximately 54,000 daily. Absent unusual circumstances, the circulation of these papers would not saturate a county with a population of nearly 340,000 persons.
The case lacked any public expression of prejudice or antagonism as in Maine v. Superior Court, supra, 68 Cal.2d 375, Frazier v. Superior Court, supra, 5 Cal.3d 287, and In re Miller, supra, 33 Cal. App.3d 1005.
The Kern County District Attorney's office conducted a survey and concluded that 88 percent of those persons polled failed to recognize the name of the case. Of those 88 percent, nearly one-half failed to recall having read or heard about the case. Less than 8 percent of the persons polled had formed any opinion about the guilt or innocence of appellant; of those, about 3 percent believed they could not disregard their opinions and decide the case on the evidence presented in court.
We conclude, therefore, that the relative obscurity of appellant, the lack of prominence of the victim, the absence of public expression of prejudice, the limited circulation of the pretrial news coverage relative to the population of Kern County, and the large number of prospective jurors called who had not heard of appellant's case, negates any reasonable likelihood that appellant did not get a fair and impartial trial.

*15 GOVERNMENT CODE SECTION 76014 DID NOT DEPRIVE APPELLANT OF A FAIR TRIAL
(4) Appellant argues that Government Code section 76014 provides for such a small fee to be paid to jurors ($5 a day (see also Pen. Code, § 1143)) that poor working persons cannot afford to serve on juries and are therefore excluded. From this he argues that he was denied the due process requirement of a fair trial. Appellant's contention is based upon surmise and conjecture; there appears no factual basis in the record to support the argument. It must be rejected on appeal. (See People v. Milan (1973) 9 Cal.3d 185, 195-196 [107 Cal. Rptr. 68, 507 P.2d 956]; People v. Johnson (1973) 33 Cal. App.3d 9, 15, fn. 2 [108 Cal. Rptr. 671]; People v. McDowell (1972) 27 Cal. App.3d 864, 870 [104 Cal. Rptr. 181]; People v. Newton (1970) 8 Cal. App.3d 359, 390 [87 Cal. Rptr. 394].)

THE JAIL TAPES WERE PROPERLY ADMITTED
(5) Appellant objects to the admissibility of the tape recorded conversation he had at the jail with his brother and sister-in-law on the grounds that the taping violated his right of privacy, that the conversations were irrelevant to the issues at trial, and that the recording was unclear.
There was no violation of appellant's right to privacy. An ordinary jail house conversation cannot be deemed to have been made in confidence. It is only when the police officers deliberately attempt to create an expectation of privacy that it is unreasonable for the authorities to moniter the conversation. (People v. Hill (1974) 12 Cal.3d 731, 764-765 [117 Cal. Rptr. 393, 528 P.2d 1]; North v. Superior Court (1972) 8 Cal.3d 301, 311-312 [104 Cal. Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]; People v. Fonville (1973) 35 Cal. App.3d 693, 707 [111 Cal. Rptr. 53]; In re Joseph A. (1973) 30 Cal. App.3d 880, 885-886 [106 Cal. Rptr. 729].) There is no evidence in the instant case that the police created such an expectation.
The conversation was highly relevant for it shows a strong consciousness of guilt. Appellant told his relatives that he didn't know how "they" got everybody's names, obviously referring to the police. Also, he explained that he had told his brother to tell Catalina "[t]o get rid of some of that stuff," obviously referring to the incriminating articles found in his brother's house. At another point appellant admitted that it would be "pretty slim" for him to get off with second degree murder.
*16 Although it appears that the court reporter had some difficulty transcribing the tape, the trial judge carefully replayed the tape for the jurors until they indicated that they understood it. The tape has been transmitted to this court as an exhibit, and it does not appear to be so unclear that the jurors could not have understood it. (See People v. Spencer (1963) 60 Cal.2d 64, 79-80 [31 Cal. Rptr. 782, 383 P.2d 134]; People v. Ketchel (1963) 59 Cal.2d 503, 519 [30 Cal. Rptr. 538, 381 P.2d 394].)

THERE WAS NO PREJUDICIAL MISCONDUCT BY THE TRIAL JUDGE
(6) During the course of the People's case in chief, a group of senior high school students visited the courtroom and watched the trial. At a recess the trial judge (Judge Walter Osborn, Jr.) took the students into chambers and answered questions. The judge told the students that he believed that appellant was guilty, that he knew that appellant had a "bad record," and that "the court was going to give [appellant] the gas chamber as a gift from Bakersfield." The judge's intemperate and inflammatory remarks were totally improper; his conduct clearly violated canon 2A of the California Code of Judicial Conduct which requires a judge to "... conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." The only question before this court, however, is whether appellant was prejudiced by the remarks and by the fact that the judge at this stage of the trial believed him guilty.
We first observe that there is nothing in the record to indicate that the jurors ever heard about the judge's comments. Thus, the question is whether there is any indication of prejudice by the judge in his rulings against appellant or by his conduct during the subsequent proceedings. We have carefully examined the record and find no such evidence of prejudice. At the hearing on the motion for new trial, the judge noted that on several occasions in ruling on evidence questions during the trial he had "leaned way over" for defendant, that there were things he knew the jury didn't know about defendant's record, and that regardless of his personal belief of appellant's guilt he constantly attempted to perform his duty of ruling impartially and correctly on all issues.
A judge is not disqualified from proceeding with a case when his state of mind appears to be adverse to a party but is based upon actual observance of the witnesses and the evidence at trial. (People v. Yeager *17 (1961) 55 Cal.2d 374, 391 [10 Cal. Rptr. 829, 359 P.2d 261]; Kreling v. Superior Court (1944) 25 Cal.2d 305, 312 [153 P.2d 734]; People v. Reyes (1976) 62 Cal. App.3d 53, 68 [132 Cal. Rptr. 848].) The trial judge in the instant case apparently formed an opinion of appellant's guilt after listening to a substantial portion of the People's case in chief. This does not mean, however, that he did not protect appellant's rights throughout the trial or that he did not view the defense case with objectivity. Judges are human; they too form opinions of the guilt or innocence of a defendant at varying stages of a trial; the wise judge simply avoids disclosing his opinion and carefully rules impartially on all questions during the trial. Absent some showing that the trial judge herein allowed his opinion of appellant's guilt to influence his conduct of the trial, the remarks cannot be deemed prejudicial.
Finally, the judge in the instant case recognized his impropriety. He advised defense counsel if there was any indication the jury was aware of his remarks he would grant a mistrial. Additionally, the judge carefully instructed the jurors that they were the sole determiners of fact.

THE PROSECUTING ATTORNEY DID NOT COMMIT PREJUDICIAL MISCONDUCT
(7) Appellant cites numerous instances of alleged prosecutorial misconduct in the argument to the jury. However, no objections were raised to any of the comments. It is fundamental that the failure to object at trial to alleged acts of prosecutorial misconduct prevents the issue from being raised for the first time on appeal unless the case is closely balanced or the harmful effect of the misconduct could not have been obviated or cured by any retraction of counsel or admonition of the court. (People v. Chojnacky (1973) 8 Cal.3d 759, 765 [106 Cal. Rptr. 106, 505 P.2d 530]; People v. Perry (1972) 7 Cal.3d 756, 790 [103 Cal. Rptr. 161, 499 P.2d 129].) In the present case it would appear that neither of these exceptions to the general rule is applicable.
In explaining that it was not the People's burden to prove defendant's guilt beyond all possible doubt, the prosecutor once said "[I]t is your obligation under the law to make a finding of guilty, ..." Contrary to defendant's contention, the prosecutor was not saying that the People had proved defendant's guilt as a matter of law; when read in context, the prosecutor was merely saying that if the People proved defendant guilty beyond a reasonable doubt, it was the jury's duty to find defendant guilty.
*18 In explaining the felony-murder rule, the prosecutor explained that all killings, even accidental killings, in the commission of rape or robbery are murder in the first degree and that the only mental state that is required is the specific intent to commit rape or the specific intent to commit robbery. Again, contrary to defendant's contention, there would appear to be nothing wrong with the prosecutor's statement of the felony-murder rule. (See People v. Wilson (1969) 1 Cal.3d 431, 441-442 [82 Cal. Rptr. 494, 462 P.2d 22]; People v. Risenhoover (1968) 70 Cal.2d 39, 50 [73 Cal. Rptr. 533, 447 P.2d 925]; People v. Washington (1965) 62 Cal.2d 777, 780-781 [44 Cal. Rptr. 442, 402 P.2d 130]; People v. Coefield (1951) 37 Cal.2d 865, 868-867 [236 P.2d 570]; People v. Fonville, supra, 35 Cal. App.3d 693, 706.)
While commenting on the fact that defendant had not produced certain evidence, the prosecutor pointed out that it was not because the defense lacked money for "[t]his [was] a case where the State [was] paying for the defense as well as the prosecution." Comments referring to a defendant's indigency should be avoided. However, the comment was not objected to and it would appear that an appropriate admonition would have cured any possible harmful effect.
A question arose at trial because of the fact that appellant's fingerprints were not found inside the stolen car. During argument the prosecutor said, "In 98% of the cases we do not find a print on a stolen car." There was nothing in the record to support such a statement. It is basic that statements of supposed facts not in evidence are a highly prejudicial form of misconduct. (See Witkin, Cal. Criminal Procedure (1963) Trial, § 450, p. 453.) However, no objection was raised to this conduct. An appropriate admonition would have cured any harmful effect.
Summing up his case, the prosecutor told the jurors that if they found defendant not guilty they would "... regret it not just today, but tomorrow and the next day and the next day." Although it would appear that the prosecutor was overzealous in his argument (see People v. Jones (1970) 7 Cal. App.3d 358, 363 [86 Cal. Rptr. 516]), an appropriate admonition would have cured any possible harmful effect had an objection been made.

THE TRIAL COURT PROPERLY INSTRUCTED THE JURY
Appellant raises several objections to the instructions given by the trial court.
*19 (8) The trial court instructed the jury on how to consider efforts to suppress evidence (CALJIC No. 2.06), evidence of other crimes (CALJIC No. 2.50), evidence of flight (CALJIC No. 2.52), and evidence of silence in face of accusatory statement (CALJIC No. 2.71.5). Defendant complains because the trial court did not specifically tell the jurors that it was solely a question of fact for them to resolve as to whether there was suppression of evidence, evidence of other crimes, evidence of flight, and evidence of silence in the face of an accusatory statement.
The contention lacks merit. In its general instructions to the jurors the trial court told them that it was their exclusive duty to decide all questions of fact (CALJIC No. 1.00). Instructions are to be read as a whole. (People v. Hardy (1969) 271 Cal. App.2d 322, 332 [76 Cal. Rptr. 557]; People v. McAuliffe (1957) 154 Cal. App.2d 332, 343 [316 P.2d 381].) The instructions given were correct as far as they went; if defendant desired further amplification, it was his duty to request it. (People v. Reed (1952) 38 Cal.2d 423, 430 [240 P.2d 590]; People v. Burrows (1968) 260 Cal. App.2d 228, 230 [67 Cal. Rptr. 28]; People v. Carothers (1946) 77 Cal. App.2d 252, 255 [175 P.2d 30].) Since defendant did not make such a request, he should not be heard to complain for the first time on appeal.
(9) Defendant objects because the trial court instructed the jury on the principle of aiding and abetting. Although defendant concedes these instructions were a correct statement of the law, he complains because there is no evidence to support such an instruction. Defendant relies on the principle that it is error to give an instruction which correctly states a principle of law which has no application to the facts of the case. (People v. Sanchez (1947) 30 Cal.2d 560, 572 [184 P.2d 673].) However, there is some evidence that two men were involved in the incident. For example, pubic hairs found in the pubic hair of the victim did not match defendant's or the victim's pubic hair. The victim at one time said "they" were already in the car, indicating that two men were involved in the kidnaping and the taking of Quinn's automobile.
(10) Lastly, defendant complains because in instructing on credibility of witnesses the court excised from the standard instruction (CALJIC No. 2.20) that one of the matters to be considered was a witness' "admission of untruthfulness." Defendant points out that one of the prosecution's experts admitted that his testimony at trial was different from that he gave at the preliminary examination. Defendant complains that because of excising the above words in question the jury was unable to evaluate properly the witness' credibility. While the trial court was in error in *20 excising this language, it is not reasonably probable that a result more favorable to defendant would have occurred had the language been included; accordingly, the error was harmless. (People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

JURY MISCONDUCT DID NOT PREJUDICE THE APPELLANT
(11a) Appellant contends that jury misconduct prejudiced his right to a fair trial. The conduct complained of occurred during deliberations when the jury foreman brought three maps into the jury room which were not part of the evidence received at trial. Two of the maps were topographical survey maps prepared and published by the Army Corps of Engineers; the maps had a scale of 1 to 250,000 and depicted contour intervals, roads, cities, towns, and other information common to these kinds of maps. One map included Bakersfield and the Kern River Canyon area. The second map included the area of Fresno east to Inyo National Forest and south to Porterville  all to the north and contiguous to the first map. The third map was a composite of five different topographical maps prepared and published by the United States Geological Survey; this composite map had a scale of 1 to 62,500 and presented an enlarged view of the Kern River Canyon and Lake Isabella areas. There were yellow markings on the maps at several locations mentioned during the trial.
The jury commenced deliberations at noon on October 8, 1975, and continued until 9 p.m. when they retired for the night. Early in the morning of October 9 before the jury resumed deliberations the bailiff went into the jury room to prepare coffee. He noticed the three maps and realizing that they were not in evidence gathered them up and turned them over to the judge who notified the parties.
Appellant moved for a mistrial on the ground that the jury had considered evidence not properly before it thereby denying the defense the right to "confront witnesses and evidence against him." The prosecutor responded that the jury can take judicial notice of geographical location of places, and moved to reopen the People's case to offer the maps in evidence. The trial judge concluded it was too late to reopen and denied the motion. The judge reviewed the nature of the jury misconduct and stated that he was trying to avoid putting the jury foreman under *21 oath; the court indicated that the matter could wait until the trial was over. The judge examined the maps and denied the motion for a mistrial. The next day the jury returned its verdict.
On October 14, 1975, appellant moved for a new trial citing among other grounds the impropriety in the use of the maps. Defense counsel asked that the jury foreman be voir dired as to what the jury did insofar as considering matters "outside of court." Defense counsel also argued that two of the jurors were from Ridgecrest and that one of the routes from Ridgecrest to the court is by the Kern River Canyon; defense counsel asked the court to voir dire these two jurors as to "... whether they took evidence themselves from the scene out in the Kern Canyon." The court denied the motion for a new trial without questioning the jurors. As to the maps, the judge stated:
"Concerning the maps in evidence, that is an unfortunate thing. I think we have it clearly of record that no one knew those maps went in. If I was guessing, I would say they probably were in the [jury foreman's] briefcase. However, during the trial, distances and locations in a general sense were discussed.
"Also, these are all citizens of Kern County, and I'm not finding this a fact but you just can't live in Kern County and not sooner or later go up that road and sort of know where everything is, ... I'm just saying that overall I think the maps were a very minor thing and not enough to, frankly, grant a new trial, because the locations were discussed in detail by witnesses. Some times and distances were mentioned. ..." (Italics added.)
(12) It is well settled that evidence obtained by jurors from sources other than in court is misconduct and constitutes grounds for a new trial if the defendant has been prejudiced thereby. (Pen. Code, § 1181, subd. 2; People v. Wong Loung (1911) 159 Cal. 520, 525-529 [114 P. 829].) The misconduct creates a presumption of prejudice (People v. Honeycutt (1977) 20 Cal.3d 150, 156 [141 Cal. Rptr. 698, 570 P.2d 1050]) which may be rebutted by a showing that no prejudice actually occurred (id., at p. 156; In re Winchester (1960) 53 Cal.2d 528, 535 [2 Cal. Rptr. 296, 348 P.2d 904]).
(13) While the cases have never articulated the standard to be applied by an appellate court in determining whether the presumption of *22 prejudice has been rebutted, it is clear that the usual "harmless error" tests for determining the prejudicial effect of an error (Chapman v. California (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 827-828, 24 A.L.R.3d 1065]; People v. Watson, supra, 46 Cal.2d 818, 836) are inapplicable. Convincing evidence of guilt does not deprive a defendant of the right to a fair trial (People v. Robarge (1952) 111 Cal. App.2d 87, 95 [244 P.2d 407]) since a fair trial includes among other things the right to an unbiased jury, the presumption of innocence, and the right to assert a defense after the prosecution has presented its case in chief. Thus, whether a defendant has been injured by jury misconduct in receiving evidence outside of court necessarily depends upon whether the jury's impartiality has been adversely affected, whether the prosecution's burden of proof has been lightened and whether any asserted defense has been contradicted. If the answer to any of these questions is in the affirmative, the defendant has been prejudiced and the conviction must be reversed. On the other hand, since jury misconduct is not per se reversible, if a review of the entire record demonstrates that the appellant has suffered no prejudice from the misconduct, a reversal is not compelled. (People v. Brown (1976) 61 Cal. App.3d 476, 481-482 [132 Cal. Rptr. 217].) The disagreement with our dissenting colleague is simply as to the manner in which the presumption of prejudice may be rebutted.
(11b) The jury misconduct in this case differs from that treated in other reported California cases. It does not involve conversations by a juror with a third party during deliberations (People v. Honeycutt, supra, 20 Cal.3d 150; Walter v. Ayvazian (1933) 134 Cal. App. 360 [25 P.2d 526]) or the reading by jurors of newspaper accounts of the trial proceedings (People v. Stokes (1894) 103 Cal. 193 [37 P. 207]; People v. Wong Loung, supra, 159 Cal. 520); nor does it involve a juror who visits the scene of a crime or accident on his own (People v. Tedesco (1934) 1 Cal.2d 211 [34 P.2d 467]; Siemsen v. Oakland, S.L., & H. Electric Ry. (1901) 134 Cal. 494 [66 P. 672]; Maffeo v. Holmes (1941) 47 Cal. App.2d 292 [117 P.2d 948]) or the conduct of experiments in the jury room or some other place outside the court (People v. Conkling (1896) 111 Cal. 616 [44 P. 314]).
Here, the jury foreman brought maps into the jury room for the obvious purpose of aiding the jury to evaluate the testimony which had been presented at trial. If the prosecution or defense had offered the maps into evidence at trial, they unquestionably would have been admitted. Evidence Code section 1341 provides in part: "[P]ublished *23 maps or charts, made by persons indifferent between the parties, are not made inadmissible by the hearsay rule when offered to prove facts of general notoriety and interest." Similarly, if the jury had requested a map to help in its deliberations the request undoubtedly would have been granted. Defense counsel would have been hard put to argue that the jury should not have the benefit of an accurate map to aid its understanding of the testimony.
Although the trial judge should have voir dired the jurors as to exactly how the maps were used, the failure to do so is not fatal in this particular case. Such questioning would have disclosed no more than that the jurors had used the maps to orient themselves to the precise locations of the events testified to by the witnesses which in turn enabled them to evaluate the testimony and the contentions of the parties. The subjective reasoning processes of the individual jurors in response to the maps could not have been gone into at the hearing. (Evid. Code, § 1150, subd. (a); People v. Hutchison (1969) 71 Cal.2d 342, 349 [78 Cal. Rptr. 196, 455 P.2d 132]; see also Krouse v. Graham (1977) 19 Cal.3d 59, 80-81 [137 Cal. Rptr. 863, 562 P.2d 1022].)
The presumption of prejudice is clearly rebutted by the record. First, there is no inconsistency between the evidence presented at trial and the facts depicted on the maps; the maps merely bring the facts testified to by the witnesses into clearer focus. The situation is somewhat analogous to the one in the Estate of Thomas (1909) 155 Cal. 488 [101 P. 798] where the jury foreman brought a magnifying glass into the jury room for the purpose of examining the handwriting in a diary in a will forgery case. Presumably, the foreman believed that the magnifying glass would help the jury to ascertain the truth about the authenticity of the handwriting and, thus, the signature on the will. The Supreme Court held that the employment of the device by the jurors in aid of their investigation of the handwriting was not improper (id., at p. 499).
In the present case appellant admitted that he had been in the Kern River Canyon at the time of the events in question. His defense was that some unknown person whom he had met at a neighboring camp at Hobo Hot Springs had stolen Mr. Quinn's car and murdered Joan Peart before driving appellant to San Jose. There was no dispute at trial about the physical terrain of the area, the location of the campsites at Hobo Hot Springs in relationship to the town of Isabella where Mr. Quinn's car was *24 stolen, or to Rocky Point where the victim was discovered after the rape. Nor was there any dispute as to any particular time sequence involving these locations. Thus, the facts depicted on the maps did not impeach appellant's witnesses or contradict appellant's alibi defense.
Nor did the jurors' use of the maps lighten the prosecution's burden of proof in any manner. Appellant was convicted by the jury on the basis of evidence totally unrelated to the maps. Such evidence was the murder weapon (.25 caliber Titan automatic) and the plaque and suitcase from Mr. Quinn's car  all left by appellant at his brother's house in San Jose after the murder. The ballistics testimony showed that the bullets found in the victim's body had been fired from the weapon which appellant had taken from his brother at Hobo Hot Springs prior to the murder. This evidence together with the devastating incriminating statements by appellant to his brother and sister-in-law at the Kern County jail conclusively demonstrate that the maps did not contribute to the verdict.
Nor can it be argued that the maps contained information which would cause a bias among the jurors against appellant; they contained only factual matters of common knowledge which cannot reasonably be disputed and of which judicial notice can be taken. (Evid. Code, § 452, subd. (g).)
The use of the maps is similar to the situation in Siemsen v. Oakland, S.L., & H. Electric Ry., supra, 134 Cal. 499 where the Supreme Court reversed the granting of defendant's motion for a new trial. The decision in that case has been adequately summarized as follows: "Where a dispute exists over the location of an accident, or the scene's exact condition has an essential bearing on the controversy, it may well be that a verdict should be set aside on proof that a juror improperly acquired knowledge by visiting the scene. But if the place of the accident and the fact that a street car ran off its track are not disputed, and there is no allegation that the car left the track because of defective rails or road bed, there is an insufficient showing to justify a new trial on the basis of an affidavit that a juror was observed between the tracks `seemingly' examining them." (Leavitt, The Jury at Work (1962) 13 Hastings L.J. 415, 429, fn. 74.) Similarly, in People v. Tugwell (1917) 32 Cal. App. 520 [163 P. 508], a juror visited the scene of a crime after the court had refused a jury view. While acknowledging this was serious misconduct deserving of severe censure, the court held there was no prejudice to the defendant since the visit was made 18 months after the crime and the condition of the premises had so changed that the juror could have obtained no *25 information which would corroborate the prosecution's evidence as to the premises at the time of the crime. (Id., at pp. 522-523.) In People v. Yee King (1914) 24 Cal. App. 509 [141 P. 1047], the fact that two jurors in a homicide case visited the scene of the crime during the progress of the trial, was held not to warrant a new trial since it did not appear that the jurors saw or heard at the place of the homicide anything different from or contradictory of the evidence adduced at the trial or that their inspection resulted in an understanding of the evidence or any fact in the case different from that conveyed to them by the sworn witnesses. (Id., at p. 513.)
In ruling on the motion for a new trial, the trial judge had all of the evidence before him and was in the best position to evaluate the prejudicial effect of the jury's use of the maps. The judge examined the maps and determined that they merely duplicated the evidence that had already been placed before the jury. The judge specifically noted that "the locations were discussed in detail by the witnesses" and "[s]ome times and distances were mentioned...." There was no prejudice resulting of the jury misconduct and no abuse of discretion in denying the motion for a new trial.
Appellant's contentions that the trial judge at the motion for a new trial should have questioned the jurors concerning whether the foreman brought any evidence into the jury room other than the maps and whether two of the jurors drove from Ridgecrest to court via the Kern River Canyon is based on pure conjecture. Nothing in the record indicates that the jurors considered any evidence out of court other than the maps. We judicially note that at the time of the trial the Kern River Canyon road for a substantial distance was a winding, steep mountain road compared to the main highway from Ridgecrest to Bakersfield via Tehachapi. Absent affirmative evidence that the jurors utilized the Kern River Canyon road in going to or from the courthouse, we must assume they traveled on the main highway.
The judgment is modified to provide a punishment of life imprisonment instead of death and, as so modified, is affirmed.[2]
Hopper, J., concurred.
*26 CHARGIN, J.,[*] Dissenting.
I respectfully dissent on the sole issue of the jury misconduct pertaining to the bringing of the maps into the jury room. The majority correctly has cited the rule that a presumption of prejudice arises from any act of jury misconduct. (People v. Honeycutt (1977) 20 Cal.3d 150, 156 [141 Cal. Rptr. 698, 570 P.2d 1050]; People v. Wong Loung (1911) 159 Cal. 520, 528-529 [114 P. 829]; People v. Conkling (1896) 111 Cal. 616, 628 [44 P. 314].) Further, I agree in substance with the majority's statement that in the instant case the presumption of prejudice would be rebutted if the three critical criteria they have articulated are satisfied (i.e., the jury misconduct in question (1) did not cause an adverse effect on the jury's function of impartially weighing the evidence, (2) did not lighten the prosecution's burden of proof and (3) did not contradict an asserted defense).
However, at the hearing on defendant's motion for a new trial the prosecution failed to produce any evidence in opposition to the undisputed fact of jury misconduct. Because of this lack of evidence the majority looks to the entire record to conclude that the above three critical criteria were satisfied, thus dispelling the presumption of prejudice. It is this manner of dispelling the presumption of prejudice with which I disagree.
The Supreme Court of this state has had before it numerous times cases involving misconduct of jurors of various types. The one thing that is clear from these cases is that once jury misconduct is established the burden is upon the prosecution to prove by evidence that the defendant has not been injured by the jury misconduct.
In People v. Brannigan (1863) 21 Cal. 337 the California Supreme Court stated: "... that the burden of proof lay upon the Government to show that the prisoner had not suffered any injury by reason of the separation of the jury, and that in the absence of such proof he was entitled to the benefit of the presumption that the irregularity had been prejudicial to him. `The prisoner ... is in such case entitled, as a matter of right, to require, in the first instance, a compliance with the ordinary forms provided by law to secure him a fair and impartial trial; and if the guards provided for his security are neglected, or disregarded, he is at least entitled to require, at the hands of the Government, satisfactory evidence that he has not received detriment by reason of such neglect, ... He has the right, therefore, to call upon the officers of the Government in such case, before they demand judgment, to show that *27 the irregularity in the trial has not been the means of injustice in the verdict.'" (Supra, 21 Cal. at p. 341.)
In People v. Turner (1870) 39 Cal. 370 a new trial was granted on the grounds of jury misconduct. On an appeal by the People the Supreme Court said: "`The evil to be guarded against is improper influence, and when an exposure to such influence is shown, and it is not shown that it failed of effect, then the presumption is against the purity of the verdict.' [Citations.] [¶] In the present case there seems to have been no effort on the part of the prosecution to rebut the presumption of improper influences exerted upon the juror, ... Under these circumstances we do not feel authorized to reverse the order of the Court below granting the defendant a new trial." (Supra, 39 Cal. at pp. 375-376.)
In People v. Stokes (1894) 103 Cal. 193, 198 [37 P. 207], it was explained that if jury misconduct is shown, it is for the prosecution "`to show as a matter of fact'" that the misconduct did not influence the verdict. It was said in People v. Conkling (1896) supra, 111 Cal. 616, 628, that "... when misconduct of jurors is shown, it is presumed to be injurious to defendant, unless the contrary appears." Then in People v. Wong Loung (1911) supra, 159 Cal. 520, 527-528, it was stated: "Upon a showing of [jury] misconduct ... the law presumes prejudice and this presumption cannot be overcome by a counter conclusion based upon a mere conjecture...."
Further, in In re Winchester (1960) 53 Cal.2d 528, 535 [2 Cal. Rptr. 296, 348 P.2d 904], the Supreme Court explained that the "burden" of rebutting the presumption of prejudice arising from jury misconduct "is upon the prosecution." Recently, in People v. Honeycutt (1977) supra, 20 Cal.3d 150, 156, it was pointed out that "... a presumption of prejudice arises from any juror misconduct" and that "... the presumption may be rebutted by proof that no prejudice actually resulted."
In short, judgments have been reversed on appeal where the prosecution has failed to present evidence in rebuttal of the presumption of prejudice arising from jury misconduct (see People v. Conkling, supra, 111 Cal. 616; People v. Brannigan, supra, 21 Cal. 337; People v. Backus (1855) 5 Cal. 275), and an order granting a new trial because of jury misconduct has been affirmed where the prosecution offered no rebuttal evidence to the presumption of prejudice (see People v. Turner, supra, 39 Cal. 370).
*28 Additionally, in Remmer v. United States (1954) 347 U.S. 227, 229 [98 L.Ed. 654, 656, 74 S.Ct. 450, 451], the United States Supreme Court explained that the presumption of prejudice arising from an improper communication with a juror "... is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."
On the other hand, in cases where a full evidentiary hearing was held on the matter of juror misconduct, including the presentation of evidence rebutting the presumption of prejudice, the convictions were not disturbed on appeal. (See People v. Rowell (1901) 133 Cal. 39, 41 [65 P. 127]; People v. Yee King (1914) 24 Cal. App. 509, 511-513 [141 P. 1047].)
The rationale behind the above mentioned cases is that the presumption of prejudice arising from jury misconduct can only be rebutted by the evidence offered at the hearing on the motion for new trial where the jury misconduct issue is raised. Furthermore, in rebutting a presumption, whether one affecting the burden of producing evidence or one affecting the burden of proof, the Evidence Code requires at a minimum the production of evidence contrary to the presumed fact. (See Cal. Law Revision Com. com. to Evid. Code, § 601, 29B West's Ann. Evid. Code, §§ 1-699 (1966 ed.) pp. 546-547; Deering's Ann. Evid. Code, §§ 500-759 (1966 ed.) pp. 165-166; see also Evid. Code, §§ 604, 606.)
In the instant case it is undisputed that the jury engaged in a serious act of misconduct. It is also undisputed that at the hearing on defendant's motion for new trial, at which the jury misconduct issue was raised, the prosecution failed to present any evidence in opposition to the motion. The presumption of prejudice arising from the jury misconduct went unrebutted; and the motion for new trial should have been granted. On appeal this court, in determining whether the presumption of prejudice associated with jury misconduct has been rebutted, should restrict itself to the evidence, if any, presented at the hearing in the trial court on the jury misconduct issue.
The law creates a presumption of prejudice for jury misconduct because of the difficulties a defendant would have in proving that the misconduct influenced the verdict. (People v. Backus, supra, 5 Cal. 275, 276.) For example, subdivision (a) of section 1150 of the Evidence Code *29 prohibits inquiry into the subjective reasoning processes of the jurors. (Krouse v. Graham (1977) 19 Cal.3d 59, 80 [137 Cal. Rptr. 863, 562 P.2d 1022]; People v. Hutchinson (1969) 71 Cal.2d 342, 349 [78 Cal. Rptr. 196, 455 P.2d 132]; People v. Adame (1973) 36 Cal. App.3d 402, 408, fn. 5 [111 Cal. Rptr. 462].) A rule allowing an appellate court to make a retrospective review of the entire record to rebut the presumption of prejudice arising from jury misconduct, as the majority has done in the instant case, is not consonant with the reasoning behind the rule establishing the presumption of prejudice in the first instance. A retrospective review of the entire record to rebut the presumption of prejudice in effect bypasses the presumption and ignores the rule that it is the prosecution's burden to present satisfactory evidence which shows as a matter of fact that the jury misconduct complained of did not injure the defendant. Defendant herein after making the undisputed showing of jury misconduct, was entitled to a hearing where the prosecution was obligated to prove with evidence that the jury misconduct in question did not prejudice defendant. Without such a hearing there is no basis in the record from which to conclude that the maps taken into the jury room did not influence the verdict. The prosecution in the instant case had a full opportunity to present the necessary evidence, if it existed, at the new trial hearing where the jury misconduct issue was raised. The prosecution elected not to produce such evidence. Having failed to do so the prosecution should not be relieved of its calamitous decision by this court's gratuitous retrospective review of the entire record.
The rule may appear harsh in application but it is warranted by the importance of the constitutional protection involved. "The right of trial by jury shall be secured to all, and remain inviolate; ..." (Cal. Const., art. I, § 7.) It is essential to the right to trial by jury that the sanctity of the deliberative process be preserved. Jurors are sworn to render a true verdict according to the evidence. (Code Civ. Proc., § 604; see Pen. Code, § 1046.) They cannot, under the oath they take, receive impressions from any other source. Jurors are instructed, "In determining whether the defendant is guilty or not guilty, you must be governed solely by the evidence received in this trial and the law as stated to you by the court." (CALJIC No. 1.00, 3d par. (3d ed. 1970).) By this instruction, as well as other admonitions given during the course of the trial (see Pen. Code, § 1122), jurors are advised of the restrictions on matters they may consider in reaching a verdict. "It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of *30 suspicion that the administration of justice has been interfered with be tolerated." (Mattox v. United States (1892) 146 U.S. 140, 149 [36 L.Ed. 917, 921, 13 S.Ct. 50, 53].)
I would reverse the judgment in its entirety.
A petition for a rehearing was denied July 13, 1978, and appellant's petition for a hearing by the Supreme Court was denied August 31, 1978. Bird, C.J., was of the opinion that the petition should be granted.
NOTES
[1] This death penalty case was originally filed as an automatic appeal in the California Supreme Court. Following Rockwell v. Superior Court (1976) 18 Cal.3d 420 [134 Cal. Rptr. 650, 556 P.2d 1101], the case was remanded to this court.
[2] The People's contention that the case should be remanded for a new death penalty trial has no merit. (People v. Henderson (1978) 80 Cal. App.3d 584, 598, fn. 13 [145 Cal. Rptr. 751]; People v. Harvey (1978) 76 Cal. App.3d 441, 445-449 [142 Cal. Rptr. 887]; People v. Payne (1977) 75 Cal. App.3d 601, 605-608 [142 Cal. Rptr. 320].)
[*] Assigned by the Chairperson of the Judicial Council.